COMMONWEALTH of Pennsylvania,
Appellee,

v.

Michael SERGE, Appellant.

Superior Court of Pennsylvania.

Submitted March 20, 2003.

Filed Dec. 3, 2003.

Joseph R. D'Andrea, Scranton, for appellant.

Christopher P. Caputo, Asst. Dist. Atty., Scranton, for Com., appellee.

Before: STEVENS, BOWES, and CAVANAUGH, JJ.

STEVENS, J.

¶ 1 This is an appeal from the judgment of sentence entered in the Court of Common Pleas of Lackawanna County after a jury convicted Appellant of first degree murder for fatally shooting his wife. Herein, Appellant challenges several of the trial court's jury instructions and evidentiary rulings, including the admission of a computer-generated animation used to illustrate expert witness testimony of the crime. For the following reasons, we affirm.

¶ 2 In the early hours of January 15, 2001, Appellant shot his wife in the back and in the chest with a .44 magnum revolver, killing her in the couple's Scott Township home. Arrested later that same morning on a charge of criminal homicide, Appellant eventually faced an amended criminal complaint charging him with one count of murder of the first degree, 18 Pa.C.S.A. § 2502(a), and one count of murder of the third degree, 18 Pa.C.S.A. § 2502(c).

¶ 3 Of the pretrial motions filed by both parties, the one pertinent to this appeal was the Commonwealth's motion *in limine* to present a computer-generated animation[1] at trial that would illustrate expert

---

1. "Animations are simply computer-generated drawings assembled frame by frame which,

witness testimonies inferring from forensic and physical evidence how Appellant shot his wife. After a July 30, 2001 hearing on the motion, the court granted the Commonwealth's motion.

¶ 4 At Appellant's jury trial of January 29, 2002 to February 12, 2002, the Commonwealth presented physical evidence, forensic testimony, demonstrative evidence in the form of a computer-generated animation, and Appellant's own incriminating statements to establish the elements of first degree murder. The superlative trial court opinion authored by the Honorable Terrence R. Nealon aptly summarizes the evidence of how Appellant shot his wife first in the lower back and then, as she knelt wounded on the living room floor, fatally through her heart:

> Dr. Gary Ross testified concerning his autopsy findings and opined that Jennifer Serge was first shot in the lower back from a distance of 3 to 5 feet as she was walking away from the assailant. As the first bullet exited her abdomen, Jennifer Serge collapsed to her knees at which time she was shot again in the right arm. The second bullet which struck Jennifer Serge traveled through her right upper arm and into her chest cavity where it pierced her heart and lungs before exiting the left side of her body. The second bullet proved to be fatal and caused Jennifer Serge to fall face first to the floor, as a result of which she suffered a circular abrasion on her left cheek from impact with her eyeglass lens. [N.T. 2/4/02 at 162–64, 186–96, 199–202, 213–16, 265–66.]

> The forensic firearms and tool marks examiner, Todd M. Neumyer, testified

that the presence and pattern of lead vaporous residue on Jennifer Serge's clothing reflected that the muzzle to garment distance for the fatal shot was less than 21 inches. [N.T. 2/6/02 at 109–120, 130, 147, 153–54].

The Pennsylvania State Police's crime scene reconstructionist, Trooper Bradley Beach, prepared a series of scale diagrams based upon the physical evidence and measurements secured at the crime scene, the dimensions of the Serge living room, the location and positioning of Jennifer Serge's body, the situs of bullet impacts and fragments throughout the room, Trooper Neumyer's opinion regarding the muzzle to garment distance, and Dr. Ross's autopsy findings with respect to the location and angles of the entry and exit wounds. Trooper Beach's diagrams portrayed the crime scene, room dimensions, body positions, bullet impact dimensions identifying where the three bullets struck certain objects in the room, dynamics of the three bullet paths, and dimensions and distances between the shooter, victim and objects in the room, including illustrations of the "z-zxis" or vertical measurements and dynamics. The crime scene reconstruction diagrams were offered to demonstrate the position of the actors and the progression of the three shots at the time of the fatal shooting. [N.T. 2/6/02 at 215–66; N.T. 2/7/02 at 98–108].

Armed with this forensic evidence and [Appellant's] incriminating and sometimes contradictory statements to the arresting officers, the Commonwealth

---

when viewed sequentially, produce the image of motion. The still frames are viewed in rapid succession, usually at a speed of 24 or 30 frames per second. The image is merely a graphic representation—a series of pictures 'drawn' by a computer operator with a computer—depicting a witness' testimony."

Galves, *Where the Not–So–Wild Things Are: Computers in the Courtroom, The Federal Rules of Evidence, and the Need for Institutional Reform and More Judicial Acceptance,* 13 Harv. L.J. & Tech. 161, 180–181 (Winter 2000). *See also* N.T. 2/7/02 at 1140–144.

argued that the defendant intentionally shot Jennifer Serge in the back, fired a second shot which missed and then stood less than 21 inches away from her as he fired the fatal shot while she was helpless on her knees. [Appellant] alleged that he had acted in self-defense as he was being attacked by his wife with a knife and asserted that he should be acquitted on the grounds of justifiable self-defense. Alternatively, [Appellant] argued that he was so intoxicated at the time of the shooting that he was incapable of formulating the specific intent to kill.

The Commonwealth countered that [the killing was intentional, and that Appellant used his decades' experience as a police officer to tamper with the crime scene to stage a self-defense setting.] ... The jury rejected the defense arguments regarding self-defense and diminished capacity due to intoxication and, therefore, found [Appellant] guilty of first degree murder on February 12, 2002. [On that same day, the court imposed a sentence of life imprisonment.]

Trial Court Opinion of 8/19/02 at 3–6. This timely appeal followed.

¶ 5 Appellant raises five issues for our review:

I. DID THE TRIAL COURT ERR AND/OR ABUSE ITS DISCRETION IN ALLOWING THE COMMONWEALTH TO PRESENT THE TESTIMONY OF TROOPER BRADLEY BEACH AS AN EXPERT IN CRIME SCENE RECONSTRUCTION THEREBY DEPRIVING THE DEFENDANT OF A FAIR TRIAL[?]

II. DID THE TRIAL COURT ERR AND/OR ABUSE ITS DISCRETION IN ADMITTING THE COMPUTER GENERATED AN-IMATION INTO EVIDENCE FOR PRESENTATION TO THE JURY IN THAT THE COMMONWEALTH FAILED TO LAY PROPER AND ADEQUATE FOUNDATION FOR SAME THROUGH THEIR WITNESS, TROOPER BRADLEY BEACH, AND THE DEMONSTRATIVE EVIDENCE WAS CUMULATIVE AND THE PREJUDICE CREATED BY SAME FAR OUTWEIGHED THE PROBATIVE VALUE IT LENT TO THE COMMONWEALTH'S CASE THEREBY DENYING THE DEFENDANT A FAIR TRIAL[?]

III. DID THE TRIAL COURT ERR AND/OR ABUSE ITS DISCRETION IN FAILING TO GIVE A(sic) THE JURY INSTRUCTION ON VOLUNTARY MANSLAUGHTER (IMPERFECT PERFECT (sic) SELF–DEFENSE) THEREBY DEPRIVING [APPELLANT] OF A FAIR TRIAL[?]

IV. DID THE TRIAL COURT ERR AND/OR ABUSE ITS DISCRETION IN ALLOWING THE MEDICAL RECORDS OF [APPELLANT] TO BE UTILIZED BY THE COMMONWEALTH DURING THE CROSS–EXAMINATION OF DR. GEORGE JACKSON IN THAT THE COMMONWEALTH PROCURED SAME IMPROPERLY, FAILED TO DISCLOSE SAID EVIDENCE TO THE DEFENSE IN VIOLATION OF THE (SIC) RULE 573 OF THE PENNSYLVANIA RULES OF CRIMINAL PROCEDURE AND IN THAT SAID RECORD WAS CLOAKED IN CONFIDEN-

TIALITY THEREBY DEPRIVING [APPELLANT] OF A FAIR TRIAL[?]

V. DID THE TRIAL COURT ERR AND/OR ABUSE ITS DISCRETION IN, OVER THE OBJECTION OF [APPELLANT'S] COUNSEL, INSTRUCTING THE JURY ON THE DUTY TO RETREAT THEREBY CONFUSING THE JURY AND DEPRIVING [APPELLANT] OF A FAIR TRIAL[?]

Brief of Appellant at 4.

 ¶ 6 The admission of evidence is a matter vested within the sound discretion of the trial court, and such a decision shall be reversed only upon a showing that the trial court abused its discretion. *Commonwealth v. Reid,* 571 Pa. 1, 811 A.2d 530 (2002). The standard for qualification of an expert witness is a liberal one. The test to be applied when qualifying an expert witness is whether the witness has any reasonable pretension to specialized knowledge on the subject under investigation. *Commonwealth v. Wallace,* 817 A.2d 485 (Pa.Super.2002). If he does, he may testify and the weight to be given to such testimony is for the trier of fact to determine. *Id.* A witness does not need formal education on the subject matter of the testimony, and may be qualified to render an expert opinion based on training and experience. *Id.*

██ ¶ 7 Under these standards and based on the record before us, we conclude that the trial court did not abuse its discretion when it permitted Trooper Beach to testify as an expert witness in the reconstruction of the Serge residence crime scene. To this end, we adopt the trial court opinion's thorough rationale that Trooper Beach's training and experience in forensic investigations and applied physics gave him a reasonable pretension to specialized knowledge and thus qualified

him to testify as an expert at trial. This legal conclusion is not altered by the fact that Trooper Beach's primary expertise lay in vehicular collision reconstruction rather than crime scene or bullet trajectory reconstruction, as Trooper Beach provided unrebutted testimony that the same reconstruction principles applied to both reconstruction contexts. Any question regarding Trooper Beach, therefore, would properly have gone not to his qualifications but to the weight that the jury was free to attach to his opinions. Clearly, the jury accepted his findings, and there exists no reason for us to disturb the jury's decision to do so. Appellant's first issue is thus without merit.

¶ 8 In his second evidentiary ruling challenge, Appellant argues that the trial court erred when it granted the Commonwealth's motion *in limine* to admit at trial a computer-generated animation illustrating expert opinions about how the fatal shooting occurred. Appellant specifically alleges that the animation lacked proper authentication, and was needlessly cumulative and otherwise unfairly prejudicial. We disagree.

 ¶ 9 In determining the admissibility of evidence, the trial court must decide whether the evidence is relevant and, if so, whether its probative value outweighs its prejudicial effect. *Commonwealth v. Hawk,* 551 Pa. 71, 77, 709 A.2d 373, 376 (1998). Evidence is relevant if it logically tends to establish a material fact in the case, tends to make a fact at issue more or less probable, or tends to support a reasonable inference or proposition regarding a material fact. Pa.R.E. 401; *Reid, supra.* Relevant evidence may nevertheless be excluded "if its probative value is outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Pa.

R.E. 403; *Commonwealth v. Kitchen*, 730 A.2d 513 (Pa.Super.1999). Because all relevant Commonwealth evidence is meant to prejudice a defendant, exclusion is limited to evidence so prejudicial that it would

> inflame the jury to make a decision based upon something other than the legal propositions relevant to the case. As this Court has noted, a trial court is not required to sanitize the trial to eliminate all unpleasant facts from the jury's consideration where those facts form part of the history and natural development of the events and offenses with which [a] defendant is charged.

*Commonwealth v. Palmer*, 700 A.2d 988, 992–993 (Pa.Super.1997).

¶ 10 Evidence used in court generally comprises three categories: testimonial evidence, documentary evidence, and demonstrative evidence. 2 McCormick on Evidence § 212 (John W. Strong et al. eds., 5th ed.1999). "Demonstrative evidence" is that which is "tendered for the purpose of rendering other evidence more comprehensible to the trier of fact." *Id.* As in the admission of any other evidence, a trial court may admit demonstra-tive evidence whose relevance outweighs any potential prejudicial effect. *Reid, supra. See also Commonwealth v. Hatcher*, 746 A.2d 1142 (Pa.Super.2000) (reasoning that non-inflammatory photographs are admissible if relevant and helpful to the jury's understanding of facts, while inflammatory photos are also admissible if their probative value outweighs potential prejudicial effect). "Demonstrative evidence, however, must also be properly authenticated by evidence sufficient to show that it is a fair and accurate representation of what it is purported to depict. Pa.R.E. 901(a). Demonstrative evidence may be authenticated by testimony from a witness who has knowledge of what the evidence is proclaimed to be. Pa.R.E. 901(b)(1)." *Reid, supra.*[2]

¶ 11 The admissibility of computer-generated animation,[3] as demonstrative evidence used to explain or illustrate expert witness testimony,[4] in a criminal proceeding is an issue of first impression in this Commonwealth. Other jurisdictions have recognized the potentially striking evidentiary force inherent in computer-generated animations,[5] and have thus required

2. *See also* 2 McCormick on Evidence § 212, *supra* ("If an article is offered for these [exclusively illustrative] purposes, rather than as real or original evidence...[,] the theory justifying admission...requires only that the item be sufficiently explanatory or illustrative of relevant testimony in the case to be of potential help to the trier of fact. Whether the admission of a particular exhibit will in fact be helpful, or will instead tend to confuse or mislead the trier, is a matter commonly viewed to be within the sound discretion of the trial court.")

3. While presiding over the present case below, Judge Nealon authored *Commonwealth v. Serge*, 58 Pa.D. & C.4th 52 (2001), which reviews the evolution of computer-generated exhibits and addresses the circumstances affecting their admissibility at trial.

4. Animations thus differ from computer-generated *simulations*, which depict not witness opinion but, instead, the computer program's own conclusions drawn from data entered into it. Simulations, therefore, constitute substantive evidence, *See State v. Farner*, 66 S.W.3d 188, 208 (Tenn.2001), and courts have required the additional proof that both the principles underlying the computer's analytic program and the data fed into the computer are sound before admitting simulations at trial. *Id.* The trial court capably distinguished *animations* from *simulations* in its jury instruction, reproduced *infra.*

5. "Since 'seeing is believing,' and demonstrative evidence appeals directly to the senses of the trier of fact, it is today universally felt that this kind of evidence possesses an immediacy and reality which endow it with particularly persuasive effect." 2 McCormick on Evidence § 212, *supra.*

prosecutors and defenders seeking to admit such animations to "establish foundational requirements such as authentication, relevance, fairness and accuracy in representing evidence, and probative value exceeding possible prejudice." Kurtis A. Kemper, J.D., Annotation, *Admissibility of Computer–Generated Animation*, 111 A.L.R.5th 529 (2003) (collecting and discussing cases); *People v. Cauley*, 32 P.3d 602 (Colo.App.2001); *Farner, supra. See also State v. Tollardo*, 2003 NMCA 122, 134 N.M. 430, 77 P.3d 1023 (2003) (discussing same criteria for admitting computer-generated animations to aid jury in understanding bullet trajectory testimony). The requirements for admitting computer-generated animations, therefore, are the same as those that apply generally for the admission of proposed demonstrative evidence. *See State v. Stewart*, 643 N.W.2d 281 (Minn.2002).[6]

¶ 12 In its Memorandum and Order of September 14, 2001, the trial court granted the Commonwealth's motion *in limine* to use the animation at trial, provided that the Commonwealth authenticate the animation as a fair and accurate depiction of expert reconstructive testimony and exclude any inflammatory features which may cause unfair prejudice as proscribed by Pa.R.E. 403. The court also required pre-trial disclosure of the animation, and stated its intention to provide a cautionary instruction to the jury regarding the exclusively demonstrative nature of the animation.[7] Trial Court Memorandum and Order of 9/14/01 at 1.

■ ¶ 13 The notes of testimony from Appellant's trial show that the Common-

wealth satisfied all foundational requirements for admitting the animation. Randy Matzkanin, director of Operations for 21st Century Forensic Animations, authenticated the animation as required under Pa. R.E. 901 by describing the process behind its making and testifying that it was a strict depiction of the Commonwealth's forensic evidence and expert opinion. N.T. 2/7/02 at 135–140. Likewise, expert witnesses Dr. Gary Ross, M.D. and Trooper Beach, whose respective opinions on how the shooting occurred brought about the animation, each confirmed that the computer-generated animation fairly and accurately depicted his opinion. N.T. 2/4/02 at 218, 265–266.

■ ¶ 14 The animation's relevance under Pa.R.E. 401 lay in its clear, concise, and accurate depiction of the Commonwealth's theory of the case, which included the rebuttal of Appellant's self-defense theory, without use of extraneous graphics or information. As such, the brief, three-dimensional animation aided jury comprehension of the numerous testimonies that, collectively, described the Commonwealth's theory of how Appellant murdered Jennifer Serge.

■ ¶ 15 Exclusion of the relevant animation under Pa.R.E. 403 was also properly denied, as the record yields that no unfair prejudice inured to Appellant's detriment. Appellant raises a claim of unfair prejudice that specifically assails the animation as needlessly cumulative to the other testimony offered by the Commonwealth. Relying in part on our above discussion on relevance, we disagree. While

---

**6.** Though not binding on this Court, the extra-jurisdictional decisions cited in this opinion aid our discussion on computer-generated animations.

**7.** The creator of the animation testified at the motion *in limine* hearing that he provides a

graphical presentation of another expert's opinion, not his or a computer model's own independent calculations or conclusions. (N.T. 7/30/01 at 25–27, 36, 54–55, 59, 63–64, 72, 77).

the animation offered no original evidence at trial, it did offer a uniquely vivid and cohesive rendition of the collective testimonies about the shooting. The effectiveness of the rendition, therefore, supplied probative value to the animation that took it beyond being merely cumulative. Appellant's Rule 403 argument based on needless cumulativeness, therefore, fails.

¶ 16 Moreover, the animation contained no inflammatory content. In depicting the Commonwealth's theory of Appellant's and Jennifer Serge's respective positions for each of the three gunshots fired, the animation emitted no sound and displayed no facial expressions, evocative movements, or evidence of injury such as blood. The animation, rather, highlighted each bullet's straight-line trajectory to demonstrate the Commonwealth's theory of how two of the three bullets recovered from the Serge's living room first pierced the body of Jennifer Serge. The final animation then depicted how the location of Jennifer Serge's body upon discovery was inconsistent with the trajectory evidence, suggesting that her body was moved afterwards, as part of Appellant's alleged attempt to stage his self-defense scene.

¶ 17 The animation thus complied with the trial court's pretrial directive that it be clinical and devoid of drama so as to prevent jury reliance on an improper emotional basis. Any prejudice derived from watching the animation, therefore, was inherent in the violent act fairly depicted therein, and was not the unfair product of the animation's manner of presentation.

¶ 18 Finally, Judge Nealon further safeguarded against the possibility of jury confusion over the animation by supplying the following appropriate cautionary instruction before the animation was played for the jury:

> Members of the jury, parties in a case are permitted to use photographs, drawings and other exhibits to illustrate a point they are attempting to make in a case. This is what we refer to as demonstrative evidence. We refer to this type of evidence as demonstrative evidence, as opposed to substantive evidence, since it is offered merely to demonstrate or illustrate a point rather than as actual proof of that point.
>
> With the advent of the digital age, computers are now used to produce this type of demonstrative evidence. You heard testimony from Dr. Gary Ross and Trooper Brad Beach that the computer-generated animation, which will now be shown to you, is a fair and accurate illustration of the opinions that they formed as to how this shooting allegedly occurred. You also heard this witness describe how he produced the three-dimensional drawings with computer software to depict those opinions, and thereafter transform them onto this DVD to produce moving images, which will be played for you. What you are about to be shown is commonly referred to as a computer-generated exhibit. There are two types of computer-generated exhibits, and you heard the witness refer to them. The first is what we call a simulation, and the second is what we refer to as an animation.
>
> In a simulation, data is entered into a computer, which is preprogrammed to perform certain calculations by applying, for example, the laws of physics, mathematical formulas and other scientific principles in order for the computer itself to draw conclusions and to attempt to recreate an incident. The end product of a simulation represents the computer program's conclusion of what happened. And the results of the computer simulation serve as the basis for the testifying expert's opinion of what happened.
>
> In contrast, an animation is simply a graphic depiction, or illustration, of an

opinion that an expert has already formed based upon his or her own independent investigation, computations, and analysis. With an animation, the computer does not perform any scientific calculations or develop any opinions, as is the case with the simulation. An animation consists of computer-generated drawings which are assembled frame by frame, and, when viewed sequentially, produce the image of motion. Thus, an animation is merely a graphic depiction or illustration of an opinion or recreation which an expert witness in the case has already devised through his or her own independent calculations and analysis.

Please understand that what you are about to view is an animation, not a simulation. This computer-generated animation is a demonstrative exhibit, not substantive evidence, and it is being offered solely as an illustration of the Commonwealth's version of events as recreated by Dr. Gary Ross and Trooper Brad Beach. You should not confuse art with reality and should not view the animation as a definitive recreation of the actual incident. The series of pictures which have been drawn by the computer and transferred on to the tape for your review are no different from a witness sketching a series of drawings on paper and then fanning those pages to portray moving images of his or her opinion.

Remember, the demonstrative animation is only as good as the underlying testimony, data, assumptions, and opinions that serve as the bases for its images, and the computer maxim, "garbage in, garbage out," applies equally to computer animations. Like all other evidence in the case, you may accept it or reject it, that is, the computer-generated animation, in whole or in part. I caution you again that the animation may only be considered for demonstrative purposes to illustrate the opinions of Dr. Gary Ross and Trooper Brad Beach. Always bear in mind that the Commonwealth must still meet its burden of proving all of the elements of the offense charged beyond a reasonable doubt.

N.T. 2/7/02 at 153–156. Judge Nealon reiterated the same concerns and instructions during his closing jury charge. In so doing, the court duly minimized any possible prejudice by insisting that the jury not make more of the animation than what it was—an illustration of expert witness testimony.

¶ 19 All requirements for admitting the computer-generated animation into evidence having thus been satisfied, we find the trial court did not abuse its discretion in allowing the jury to view this demonstrative evidence.

¶ 20 The last of Appellant's evidentiary challenges appears in his fourth issue, where he argues that the court erred in permitting the Commonwealth to introduce certain medical records during its cross-examination of defense witness, forensic toxicologist George Jackson, Ph.D. On direct examination, Dr. Jackson extrapolated backwards from 11:23 a.m. on January 15, 2001, when Appellant's BAC was .10%, to 2:15 a.m., the approximate time of the shooting, and determined that Appellant's BAC at that time would have been between .235% and .325%. N.T. 2/8/02 at 167–169. Such levels of blood alcohol content, Dr. Jackson testified, would cause significant impairment to one's "judgment[,] perception, alertness, memory, response time and in the normal sense of care and caution." N.T. 2/8/02 at 170.

¶ 21 On cross-examination, Dr. Jackson testified that his opinion of Appellant's significant impairment was based on the assumption that Appellant is "in the bell-shaped curve, as an average individual. No evidence has been presented to me to show that he lies outside of that bell-

shaped curve." N.T. 2/8/02 at 182. The Commonwealth then asked Dr. Jackson if Appellant's previous ability to survive a .57% BAC would place Appellant outside the bell-curve. Dr. Jackson responded that he would need to have more information, to "see how the analysis was performed and what setting it was performed in." N.T. 2/8/02 at 182. After a lengthy side-bar and defense objection, the Commonwealth was permitted to cross-examine Dr. Jackson with a hospital record from approximately six months prior to the shooting which indicated that Appellant was conscious and conversant with hospital personnel despite having a .57% serum level, or .483% to .51% BAC at the time. N.T. 2/8/02 at 202, 205. Based on that report, Dr. Jackson admitted that Appellant possessed constitutional functional tolerance to alcohol beyond the norm. N.T. 2/8/02 at 206.

¶ 22 Appellant contends that use of the hospital report violated his right to medical confidentiality, constituted a hearsay violation, was not admissible since, defense claims, it was not produced in discovery. In finding no merit to these claims, we rely on the trial court's 1925(a) opinion, which: implies a *de minimis* privacy interest in Appellant's hospital-generated BAC test report, and cites *Commonwealth v. Ellis*, 415 Pa.Super. 220, 608 A.2d 1090, (Pa.Super.1992) for the proposition that, notwithstanding regulations regarding medical record confidentiality, information in medical records is admissible in criminal proceedings where necessary for the administration of justice; finds that Appellant, in any event, waived any confidentiality in the report by placing his alcohol tolerance into dispute; cites Pa.R.E. 803(6), excepting factual information contained in hospi-

tal records from the rule against admitting hearsay, to reject Appellant's hearsay claim; and rejects Appellant's discovery claim because defense counsel established neither that the hospital report was not among hospital records produced during discovery nor that the alleged discovery violation caused unfair prejudice warranting a new trial. Accordingly, Appellant may gain no relief on this claim.

¶ 23 Appellant's third and fifth issues each challenge the court's discretion regarding jury instructions. A trial court has wide discretion in phrasing jury instructions, and absent an abuse of discretion or an inaccurate statement of law, there is no reversible error. *Commonwealth v. Hudson*, 820 A.2d 720 (Pa.Super.2003). In questions concerning jury instructions, in determining whether the trial judge committed an abuse of discretion or error of law, the court considers the charge as a whole in light of the evidence presented. If error is found to have been committed, a new trial is warranted only where such error has been clearly prejudicial to the appellant. *Commonwealth v. Birch*, 434 Pa.Super. 575, 644 A.2d 759 (1994).

¶ 24 Appellant's third issue challenges the trial court's refusal to charge the jury on the theory of "imperfect self-defense," or "unreasonable belief voluntary manslaughter," as found under 18 Pa.C.S. § 2503(b).[8] A self-defense claim under this theory is "imperfect in only one respect—an unreasonable rather than a reasonable belief that deadly force was required to save the actor's life. All other principles of justification under 18 Pa.C.S. § 505 must [still be met in order to

8. 18 Pa.C.S. § 2503(b) provides:
 A person who intentionally or knowingly kills an individual commits voluntary manslaughter if at the time of the killing he believes the circumstances to be such that,

if they existed, would justify the killing under Chapter 5 of this title (relating to general principles of justification), but his belief is unreasonable.

establish] unreasonable belief voluntary manslaughter." *Commonwealth v. Tilley,* 528 Pa. 125, 141, 595 A.2d 575, 582 (1991). In order to establish the defense of self-defense under 18 Pa.C.S. § 505,[9] the defendant must not only show that he was protecting himself against the use of unlawful force, but must also show that he was free from fault in provoking or continuing the difficulty which resulted in the killing. *See* 18 Pa.C.S. § 505; *Commonwealth v. Bracey,* 568 Pa. 264, 285, 795 A.2d 935, 947 (2001).

¶ 25 Appellant bases his argument for an imperfect self-defense charge on BAC and extrapolation evidence that he was intoxicated at the time of the shooting. Our jurisprudence, however, has rejected the imperfect self-defense reduction based on voluntary intoxication. *See Commonwealth v. Sheppard,* 436 Pa.Super. 584, 648 A.2d 563, 569 (1994) (recognizing that voluntary intoxication presents only a diminished capacity defense, which at best reduces the degree of homicide from first to third degree).[10] "An imperfect self-defense, pursuant to section 2503(b), does not fit within [this] categor[y] and is more in the nature of perception based upon faulty analysis of the circumstances, or state of mind arising from a pattern or history of interaction, which would lead to a reaction based on fear of one's safety arising out of previous abuse." *Id.*

¶ 26 Under these standards, the trial court properly refused to give an imperfect self-defense instruction when Appellant had introduced nothing more than evidence of his voluntary intoxication. Moreover, even if the imperfect self-defense theory were relevant to Appellant's case, we would find that Appellant failed to offer requisite evidence challenging the inference that Appellant "continued the difficulty which resulted in the killing" when he fired the fatal shot into a kneeling, wounded, and non-threatening Jennifer Serge.

¶ 27 Appellant's other jury instruction challenge, found in his fifth issue, states that the trial court confused the jury by referring to a duty to retreat in the self-defense instruction, despite the fact that the shooting took place in Appellant's home.

¶ 28 Pertinent to this issue is the following portion of the trial court's legal instruction on the four requirements to a self-defense defense when deadly force is used:

Fourth, the defendant must not have violated any duty to retreat which would have enabled him to avoid the necessity of using such force and would have enabled him to retreat with complete safety. As a general rule, a defendant has a duty to retreat before resorting to deadly force in self-defense if he knows he

---

9. 18 Pa.C.S. § 505 provides:

> The use of force upon or toward another person is justifiable when the actor believes that such force is immediately necessary for the purpose of protecting himself against the use of unlawful force by such other person on the present occasion.

10. 18 Pa.C.S. § 308, Intoxication or drugged condition, provides:

> Neither voluntary intoxication nor voluntary drugged condition is a defense to a criminal charge, nor may evidence of such conditions be introduced to negative the

> element of intent of the offense, except that evidence of such intoxication or drugged condition of the defendant may be offered by the defendant whenever it is relevant to reduce murder from a higher degree to a lower degree of murder.

Moreover, a defendant is not entitled to a diminished capacity charge unless he introduces evidence that shows use of intoxicants overwhelmed or overpowered him to the point of losing control over his faculties. *Commonwealth v. Randall,* 758 A.2d 669, 683 (Pa.Super.2000). Appellant introduced no such evidence.

can avoid the necessity of using such force with complete safety by retreating. *However, if the encounter takes place in the defendant's own dwelling, he has no duty to retreat from his own home unless he was the initial aggressor.*

\* \* \*

In sum, you cannot find the defendant guilty of murder unless you are satisfied beyond a reasonable doubt first...; or fourth, that the defendant had a duty to retreat and such retreat was possible with complete safety. If you find that any one of these four elements has been established beyond a reasonable doubt, then the defense of justification or justifiable self-defense has not been made out.

N.T. 2/12/02 at 39–42 (emphasis added).

¶ 29 The trial court's main instruction adequately and accurately presented the law on use of deadly force in self-defense as found under Section 505, which includes a general duty to retreat, an exception to that general rule when a person is in his dwelling, and an exception to the exception if the person is the initial aggressor. *See Commonwealth v. Derby*, 451 Pa.Super. 100, 678 A.2d 784 (1996) (holding that actor is not required to retreat from his dwelling unless he is initial aggressor). A jury could have fairly inferred from the evidence that the "initial aggressor" exception to the exception applied,[11] thus substantiating instruction on the duty to retreat.

■ ¶ 30 Nor did the court's subsequent summation confuse or contradict this main instruction; rather, it confirmed that guilt could not be found unless the

Commonwealth disproved beyond a reasonable doubt one of the four requirements to a justifiable self-defense defense. Again, one self-defense requirement was that Appellant not have violated a duty to retreat if he were the initial aggressor in his home, and it was for the jury to determine if such a duty arose, and went ignored, under the facts of the case. Accordingly, we find no error with the self-defense instruction.

¶ 31 For the foregoing reasons, we affirm the judgment of sentence entered below.

¶ 32 Affirmed.

---

11. Without speaking to the plausibility of each, we note three possible scenarios emerged from the evidence presented: (1) Appellant was the sole aggressor and staged a self-defense scene after the fact; (2) Appellant was the initial aggressor and fatally shot Jennifer Serge after she countered with a knife;

(3) Jennifer Serge was the initial aggressor and Appellant countered with his gun. The instruction on the "no duty to retreat from one's dwelling" exception pertains to the third scenario, while the instruction on the "initial aggressor" exception to the exception pertains to the second scenario.