J-S38005-18

NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| ADRIENE WILLIAMS | : | |
| | : | |
| Appellant | : | No. 220 WDA 2017 |

Appeal from the Judgment of Sentence August 26, 2016
In the Court of Common Pleas of Allegheny County Criminal Division at
No(s):  CP-02-CR-0009769-2015

BEFORE:   BOWES, J., NICHOLS, J., and STRASSBURGER*, J.

MEMORANDUM BY BOWES, J.:                    FILED DECEMBER 28, 2018

Adriene Williams appeals from the August 26, 2016 judgment of sentence of twenty to forty years imprisonment in the aggregate, following her conviction of third-degree murder, abuse of a corpse, and tampering with physical evidence.  We affirm.

The trial court summarized the events of June 14, 2015, as developed at trial.

> Between 4:00 p.m. and 5:00 p.m., [Appellant] dropped off her three-year-old daughter, Adrionna, at [Appellant]'s mother's house.  [Appellant]'s mother, Lucille Williams, routinely watched Adrionna while [Appellant] was at work.  [Appellant was a security guard.  She had arrived at her mother's house wearing casual clothing and she changed into her security guard uniform at her mother's house.  While at Lucille Williams' house, Adrionna asked to eat some watermelon.  [Appellant] went to the kitchen to get some watermelon for her daughter.  After a few minutes, Lucille Williams went to the restroom.  Family members noticed Adrionna run from one room toward the front door of the residence to give [Appellant] a kiss before she left for work.  When Lucille Williams

_____
*   Retired Senior Judge assigned to the Superior Court.

came out of the bathroom, [Appellant] was gone. Lucille Williams believed that [Appellant] had left for work. Adrionna was also missing from the residence. The last anyone saw of Adrionna was when she left one room of the residence and ran toward the front door to give her mother a kiss. Lucille Williams and two other occupants of the residence began looking around the residence for Adrionna without success. The family members frantically attempted to call and send text messages to [Appellant] to inquire if she knew anything about Adrionna's location. [Appellant] did not answer her phone or respond to any text messages for approximately ten to fifteen minutes. When [Appellant] finally responded to the efforts to reach her, [Appellant] claimed that Adrionna was not with her and she did not know Adrionna's location. Additional calls and text messages to [Appellant] went unreturned for approximately 30 minutes. [Appellant] then returned to Lucille Williams'[s] residence. [Appellant] changed clothes and began to look for her daughter.

At approximately 7:50 p.m., about an hour after Adrionna went missing, Adrionna's body was discovered by someone walking her dog about three miles from Lucille Williams'[s] residence. Adrionna's body was found lying on the side of a dirt pile strewn with rocks, road debris and downed trees. Bright, multi-colored paper clips were found near Adrionna's body. Emergency personnel were summoned to the scene and Adrionna was confirmed dead. Trial testimony indicated that Adrionna had died from asphyxiation. She had redness and abrasions above her right eye and forehead area.

A police investigation ensued. Upon being questioned about her whereabouts at the time Adrionna went missing, [Appellant] advised detectives that she was at work. She acknowledged that she responded via a text message that Adrionna was not with her. She explained that by the time she had made contact with her family, she was driving in her car, on her way to her mother's residence to help find Adrionna. When she returned to her mother's house, [Appellant]'s shoes were mud-covered. [Appellant]'s car was searched and bright, multi-colored paper clips were found in the car. The paper clips were of the same type (size and color) that were found at the location where Adrianna's body was found. Also found was a notebook in which the defendant complained of the difficulties of single-parenting. [Appellant]'s work shirt was recovered from her vehicle and there was a stain on the shoulder area of the shirt. That shirt was sent

to the Allegheny County Crime Lab for analysis. Results of testing revealed that the stain on the work shirt was from watermelon.

Cell phone tower data was admitted at trial. The evidence showed that at the time [Appellant] claimed she was at work, her cell phone 'pinged' a cell phone tower located in an area near where Adrionna's body was found. Furthermore, surveillance videos of the area where Adrionna's body was found disclosed that a vehicle fitting the description of [Appellant]'s vehicle traveled near, and generally in the direction of, the area where Adrionna's body was found.

Trial Court Opinion, 11/29/17, at 2-4.

On the third day of trial, there was an in-chambers meeting with all counsel and Detective Steven Hitchings of the Allegheny County Police Homicide Unit. Detective Hitchings reported that he was approached in the hall by a woman who identified herself as Angel Jackson, a friend of the Williams family. She told the detective that she spoke that morning to Shaneequa Romaine of Buffalo, New York, and that Ms. Romaine told her that a child died while in foster care provided by Lucille Williams. Ms. Romaine also represented that Lucille and an adult female named Sonya used to routinely beat these foster children, one of whom was Appellant.[1]

Defense counsel initially sought a recess to discuss the matter with his supervisor. The court encouraged defense counsel to investigate these allegations over the lunch hour, and to report back. Defense counsel later

---

[1] Ms. Jackson also offered information that Adrionna's father was due to be released from prison four days prior to her death, and that he intended to seek custody. Further investigation revealed that the victim's father was still incarcerated when she was killed.

advised the court and the Commonwealth that Ms. Romaine answered his phone call, and that she advised him that her mother is Lucille's sister.

The Commonwealth expressed its belief that the defense should be able to explore this further. The court asked defense counsel whether there was a need to stop the trial. N.T. Jury Trial, 8/15-26/16, at 358. Defense counsel argued that trial should be halted to permit an investigation as the Commonwealth's evidence did not rule out the possibility that someone else in the home harmed the child, and that Appellant, or someone operating her vehicle, transported the body to the location where it was found. Id. at 358. The defense moved for a mistrial in order to send its investigator to Buffalo. The Commonwealth urged the court to hold the jury and see what the defense could ascertain by the next day. The court sent the jury home but held the motion for mistrial in abeyance. Id. at 364.

When trial recommenced on Friday morning, defense counsel reported that although Ms. Romaine had some personal knowledge of the death of a child in Lucille's care in the mid-90s, maybe 1997, she was young when Lucille fostered children. The Commonwealth had contacted agencies in Buffalo and confirmed that Lucille was a foster mother there from 1990-98. In 1996, Lucille had custody of an infant infected with hepatitis C, who lived one year, and died while in her care. The discussion focused on the relevance of this line of inquiry as there were no charges filed.

In response to the defense's argument that it was relevant whether Lucille was abusive to Ms. Romaine and Appellant, the court noted that defense counsel should have known, with due diligence, of any such abuse after meeting with his client. The court denied the motion for mistrial, without prejudice. The court specifically told the defense it could renew the motion on Monday if, after further investigation, it had additional pertinent information. Id. at 388. The defense did not renew the motion for mistrial on Monday morning. However, several days later, at the close of the Commonwealth's case, a discussion was held at sidebar. The court inquired whether the defense intended to pursue any other remedies with regard to Ms. Romaine. The defense represented that "[r]elative to her, I think we are pretty much done here." Id. at 571. The witness had informed their investigator that she was not willing to discuss anything further. Nevertheless, defense counsel renewed the motion for nonsuit, arguing that if they had the opportunity to investigate this matter without the pressure of an ongoing trial, it was possible that Ms. Romaine would have come in. Counsel described it a "catch-22" situation, where he needed Ms. Romaine to make the required factual averment that would enable the court to rule upon the mistrial motion, but surrounding circumstances made it impossible. Id. at 573. After the defense formally placed its renewed motion for mistrial on the record, the trial court asked whether the defense was indicating that it did not have sufficient factual basis to present anything from this witness that

might affect Appellant's defense. Defense counsel answered that question in the affirmative, confirming that they "just don't have enough to even know what she would say at this point." *Id.* at 580. The trial court ruled that there was no compelling basis for a mistrial, and denied the motion. *Id.* at 597.

At the conclusion of the trial, the jury convicted Appellant of the aforementioned charges. Appellant was sentenced on January 17, 2017, and her post-sentence motions were denied on January 30, 2017. Appellant timely appealed, and complied with the trial court's order to file a Pa.R.A.P. 1925(b) concise statement of issues complained of on appeal. The trial court penned its Rule 1925(a) opinion, and the matter is ripe for our review.

Appellant presents two issues on appeal:

1. Did the trial court improperly deny [Appellant's] motion for mistrial when presented with information that could lead a jury to believe that a credible alternative suspect exists, but which, due to the last minute nature of the disclosure counsel was not able to properly investigate?

2. Did the trial court err in permitting the Commonwealth to offer the testimony of Ms. Pamela Woods of the Allegheny County Medical Examiner's Office when Ms. Woods lacked the training and experience necessary to qualify as an expert and could not offer her opinion within the degree of scientific certainty required by law?

Appellant's brief at 4.

Appellant contends that the trial court abused its discretion in declining to grant a mistrial after a friend of Appellant's family approached Detective Hitchings and told him that she had information from Ms. Romaine that a child had died while in foster care provided by Appellant's mother, and that

Appellant's mother would routinely beat children, including Appellant. Appellant cites Commonwealth v. Tharp, 830 A.2d 519 (Pa. 2012), in support of her contention that the failure to declare a mistrial was so prejudicial as to deprive her of a fair trial.

The Commonwealth counters that, after the witness refused to cooperate, Appellant abandoned the request for a mistrial as she did not renew her motion. Thus, the Commonwealth argues, the request for a mistrial should be deemed waived or, in the alternative, the trial court properly exercised its discretion in denying the motion initially, and later, in not granting a mistrial sua sponte. The Commonwealth relies upon Pa.R.Crim.P. 605, which provides that the defense must move for a mistrial when the prejudicial event is disclosed, and that otherwise, a trial court can only declare a mistrial "for reasons of manifest necessity." Pa.R.Crim.P. 605(B). A mistrial was granted on the latter basis in Commonwealth v. Orie, 88 A.3d 983 (Pa.Super. 2014), where the court determined that the defense's admission of forged documents perpetrated a fraud upon the court that so undermined the jury's function that only a mistrial could cure the harm. The Commonwealth argues that there was no manifest necessity that compelled similar action in this case.

In reviewing a trial court's denial of a motion for mistrial, our review is limited to determining whether the court's ruling was an abuse of discretion. Commonwealth v. Chamberlain, 30 A.3d 381, 422 (Pa. 2011). "An abuse of discretion is not merely an error of judgment, but if in reaching a conclusion

the law is overridden or misapplied, or the judgment is manifestly unreasonable, or the result of partiality, prejudice, bias, or ill-will . . . discretion is abused." Id. Such a motion should be granted "only where the incident . . . is of such a nature that its unavoidable effect is to deprive the defendant of a fair trial by preventing the jury from weighing and rendering a true verdict." Id.

The trial court concluded that the report that a child died while in the care of Lucille Williams thirty years before was never substantiated. Additionally, "there was no credible, admissible evidence presented . . . that Lucille Williams [Appellant's mother] was abusive toward foster children." Trial Court Opinion, 11/29/17, at 19. Thus, there was no impeachment or exculpatory evidence that was excluded due to the denial of the motion for mistrial. Id.

Preliminarily, we note that Appellant renewed her motion for a mistrial at the close of the Commonwealth's case.[2] Hence, the Commonwealth's waiver argument lacks traction. Nonetheless, the defense conceded at that time that it had failed to establish the factual predicate for a mistrial. Id. at 579. Although the trial court had approved the retention of a private investigator to assist the defense in exploring the allegations against Lucille

_____

[2] Appellant's statement in her brief that she did not renew the motion for mistrial after Ms. Romaine refused to cooperate with the defense investigator is refuted by the record. Appellant's brief at 12. See N.T. Jury Trial, 8/15-26/16, at 578-79.

Williams, the defense conceded that it did not have anything from Ms. Romaine with regard to matters that might affect Appellant's defense, and that they did not know what she would say at this point. I d. On these facts, we find no abuse of discretion on the part of the trial court in refusing to grant the mistrial.[3]

Appellant's second issue fares no better. Appellant claims that the trial court abused its discretion when it permitted Ms. Pamela Woods of the Allegheny County Medical Examiner's Officer to testify outside the scope of her expertise. Specifically, Appellant alleges that under Yacoub v. Lehigh Valley Medical Associates, P.C., 805 A.2d 579 (Pa.Super. 2002), Ms. Woods lacked "any reasonable pretension to specialized knowledge" of plant matter that would qualify her to testify regarding the comparison of the victim's stomach contents and the sample from the stain on Appellant's shirt. According to Appellant, this was botany, not forensic chemistry, and the expert was not a botanist. The trial court ruled that Ms. Woods's education and decades of experience, including expertise in Fourier Transform Infrared Spectrometry ("FTIR"), qualified her to render her opinion that the substance taken from Adrionna's stomach may have shared a common source of origin

_____

[3] As distinguished from the typical case where a mistrial is granted, this is not a situation where the jury was apprised of information that was so prejudicial that it prevented it from rendering a true verdict. Herein, the jury was unaware of the unsubstantiated accusations of decades-old misconduct leveled against Lucille Williams.

with the stain on Appellant's shirt.  We find no abuse of discretion for the reasons that follow.

The admission of expert testimony is a matter of discretion for the trial court, and we will not reverse the trial court's ruling absent an abuse of that discretion.  Commonwealth v. Yale, 150 A.3d 979, 985 n.11 (Pa.Super. 2016).  The question whether a witness qualifies as an expert also rests with the sound discretion of the trial court.  Commonwealth v. Serge, 837 A.2d 1255, 1260 (Pa.Super. 2003).  The standard for qualification of an expert witness is a liberal one: whether the witness has any reasonable pretension to specialized knowledge on the subject under investigation.  Yale, supra at 985 n.11 (citing Commonwealth v. Wallace, 817 A.2d 485 (Pa.Super. 2002)).  Training and experience may suffice even where a witness lacks formal education on the subject matter.  Id.; see also Commonwealth v. Toritto, 67 A.3d 29, 37 (Pa.Super. 2013).

The record reveals that Ms. Woods holds both a Bachelor of Science degree in chemistry and a Master's degree in forensic chemistry from Duquesne University.  She had completed many courses offered by the FBI and private institutions, and additional college classes.  At the time of trial, she had worked for twenty-one years in the Allegheny County Medical Examiner's Office in the Trace Evidence Department.  N.T. Jury Trial, 8/15-26/16, at 486.  She described trace evidence as "hair, fiber, explosives, fire debris, tape residues, any adhesives, polymers."  Id. at 486-87.  She had

been qualified to offer expert testimony in the field of trace evidence approximately forty-five to fifty-five times. Id. at 488.

Appellant's sole objection to Ms. Woods's qualifications was that she was not a botanist. Counsel argued that Ms. Woods lacked the training and expertise to opine that watermelon was present in the child's stomach by comparing that substance with a known sample of watermelon. Id. Counsel examined the witness further regarding her experience in microscopic techniques, and specifically, FTIR, which uses light to compare an unknown substance "visually, and microscopically, and instrumentally," with a known substance. Id. at 490. A scientist can conclude from this comparison either that the two substances are consistent, meaning they contain the same properties; inconsistent, meaning they do not contain the same properties; or inconclusive, meaning unable to see sufficient similarities or differences to generate a finding. Id. at 491. Ms. Woods had previously compared items that were vegetable or plant matter, specifically marijuana samples, using a similar approach with more sophisticated microscopes.[4] Id.

On the record before us, we find no abuse of discretion in permitting Ms. Woods to testify. She had "a reasonable pretension to specialized knowledge"

_____

[4] Appellant also objected to the admissibility of Ms. Woods's opinion that lycopene was consistent between the two samples on the ground that it was not probative of whether lycopene was the source of the pigment in the samples with any degree of certainty, let alone reasonable scientific certainty. Appellant abandoned that contention on appeal.

of the use of FTIR to compare the chemical composition of biological stains. Yale, supra at 985 n.11. Not only did she have an extensive academic background in chemistry, she had been trained in the scientific technique used. We have no basis to disturb the trial court's conclusion that Ms. Woods was qualified to testify as an expert regarding her comparison of the samples using FTIR.

Judgment of sentence affirmed.

Judge Nichols joins the memorandum.

Judge Strassburger files a concurring memorandum.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 12/28/2018