J-S33013-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| WILLIAM FREDERIC HUDSON | : | |
| | : | |
| Appellant | : | No. 15 MDA 2024 |

Appeal from the Judgment of Sentence Entered November 9, 2023
In the Court of Common Pleas of York County Criminal Division at No(s):
CP-67-CR-0003604-2021

BEFORE:  OLSON, J., KUNSELMAN, J., and NICHOLS, J.

MEMORANDUM BY OLSON, J.:  **FILED: OCTOBER 31, 2024**

Appellant, William Frederic Hudson, appeals from the November 9, 2023 judgment of sentence entered in the Court of Common Pleas of York County after a jury convicted Appellant of first-degree murder.[1]  The trial court sentenced Appellant to a term of life imprisonment without the possibility of parole.[2]  After careful review, we affirm.

The trial court summarized the factual and procedural history as follows:

---

[1] 18 Pa.C.S.A. § 3502(a).  Appellant was also charged with third-degree murder, which the trial court *nolle prossed* at the time of sentencing.  **See** Sentencing Order, 11/9/23.

[2] The trial court found Appellant was not eligible for boot camp or the risk recidivism reduction incentive program.  Appellant was ordered to pay restitution in the amount of $5,063.29 and received credit of 862 days (June 30, 2021, to November 9, 2023) for time served.  **See** Sentencing Order, 11/9/23.

[At trial,] Appellant testified that[,] on the evening of June 24, 2021, Appellant and [the victim] spent the evening at their residence located [in Lewisberry, Pennsylvania,] drinking alcoholic beverages in their backyard by the firepit. Both Appellant and [the victim] became intoxicated.

Appellant testified that a bright motion-sensor light coming from a neighbor's residence shined into Appellant and [the victim's] backyard. Appellant walked to the neighbor's house and asked if one of the residents[] could turn the light off. Appellant and [the victim] ended up spending approximately 30 minutes at the neighbor['s] house. Appellant testified that at some point during a discussion with the neighbors, [the victim] stated that she "was a pothead." Appellant testified that this statement made him upset.

Appellant testified that[,] as he and [the victim] were walking back to their house, [the victim] began stumbling and fell to the ground. Appellant stated that he became angry, removed his shirt, threw it on the ground, went inside his house, and locked the door. Appellant stated he was "trying to calm down" and "cool off" and that he picked up a dining room chair and banged it against the wall several times, until the chair broke. Appellant subsequently went to bed.

Shortly thereafter, Appellant heard knocking at the door, got out of bed, and answered the back door of his residence. When Appellant answered the door, [the neighbor] was with [the victim.] Appellant testified that [the victim] subsequently came inside, saw the broken dining room chair, and began yelling at Appellant. Appellant testified that he and [the victim] had a verbal argument for several minutes. Appellant testified that [the victim] picked up a piece of the broken chair that had been lying [] between the kitchen and dining room and began swinging it at Appellant's head. Appellant testified that he was hit in the left shoulder and the side of his hand, breaking a bone in his hand.

Next, Appellant testified that he proceeded to the back bedroom to "get away from [the victim]." Appellant testified that [the victim] followed him to the bedroom, where they continued to have a verbal argument for two or three minutes. Appellant testified that [the victim] stated, "I'm getting a knife," turned around, left the bedroom, and went down the hallway towards the kitchen. Appellant retrieved his handgun from a case beside his bed. When asked if he had to load the gun, Appellant testified

that he "had to click the magazine in" and "pull the slide back to get a bullet in the chamber" and that Appellant had "distinct memory of doing those two things as he was pursuing [the victim]." Appellant subsequently followed [the victim] into the hallway.

Appellant testified that he remembered asking [the victim] many times to "stop" and "don't get the knife." Appellant stated he put the [hand]gun in front of him, pointed it in [the victim's] direction, and pulled the trigger. Appellant did not remember any of the subsequent shots. Appellant's next memory is "crying[,] kneeling beside [the victim]" and then picking up the [hand]gun and walking back to the bedroom.

Appellant testified that while he was in the bedroom, he "pulled the slide back" which ejected a bullet. Next, Appellant testified that he put the [hand]gun towards his head and shot; however, the bullet did not hit him. Appellant then went back [] to where [the victim] was lying deceased and knelt again. Appellant shot the firearm, and the bullet went through his head and came out his forehead. Appellant testified that he [did not] "remember anything after shooting himself for quite some time" but later remembered being awake at some point. Appellant eventually texted his father[] who arrived at Appellant's residence shortly thereafter and called 911 [emergency services].

On June 26, 2021, at approximately 10:01 a.m., Fairview Township police officers were dispatched [to] Appellant's residence. [The police] officers arrived at the residence and found [the victim] deceased with "a large amount of blood that appeared to be coming from her head"[] and a "pistol on the floor beside her." Appellant was found in the living room covered in blood and "what appeared to be a bullet entry hole on the underside of his chin and a bullet exit hole in his forehead." Appellant was immediately taken into custody and given his *Miranda* warnings,[3] which Appellant advised he understood and waived. Appellant was subsequently transported to the hospital.

Officer Chad Bowman of the Fairview Township Police Department [("Officer Bowman")] accompanied Appellant in the ambulance, at which time Officer Bowman asked Appellant what he thought

_____

[3] *Miranda v. Arizona*, 384 U.S. 436 (1966).

happened to which Appellant pointed to himself and stated, "I probably did it."

[Several police] officers effectuated a search warrant at the residence and seized numerous items, including a Canik Elite 9-millimeter semi-automatic pistol and "spent shell casings." The shell casings and numerous live 9mm rounds were found "in a clear path from the [] bedroom through the hallway and into the dining room where [the victim] was found deceased." Additionally, [police] officers found "an empty box for the 9mm handgun next to the bed where the shots appeared to have begun" and "pools of blood and blood spatter throughout the house."

[The victim's] autopsy indicated multiple gunshot wounds to her back, left arm, and back of her head.

On August 24, 2021, Appellant was charged with [first-degree] murder [] pursuant to 18 Pa.C.S.A. [§] 2502(a) and [third-degree] murder [] pursuant to 18 Pa.C.S.A. [§] 2502(c).

On February 17, 2023, Jennifer Smith, Esquire, entered her appearance as counsel for Appellant.

The [trial] court conducted a jury trial from August 28, 2023, through September 1, 2023. At trial, Appellant requested the [trial] court instruct the jury on voluntary intoxication. Additionally, Appellant requested a jury instruction on voluntary manslaughter, based upon two theories (1) imperfect self-defense, and (2) heat of passion in response to serious provocation. The [trial] court granted Appellant's motion for the voluntary intoxication jury instruction. The [trial] court denied Appellant's motion for the voluntary and involuntary manslaughter instructions, finding that the evidence presented at trial did not support those charges.

At the conclusion of trial, the jury found Appellant guilty of [first-degree] murder[.] Because Appellant was found guilty of first-degree murder, [the] jury did not return a verdict on third-degree murder.

On November 9, 2023, the [trial] court sentenced Appellant to life in prison without the possibility of parole.

On November 20, 2023, Appellant filed a post-sentence motion[, requesting] a new trial. On November 28, 2023, the [trial] court denied the motion.

Trial Court Opinion, 3/26/24, at 1-6 (extraneous capitalization, record citations, and original brackets omitted). This appeal followed.[4]

Appellant raises the following issue for our review:

Whether the [trial c]ourt abused its discretion or committed an error of law when it did not grant the defense request to have the jury instructed on voluntary manslaughter where the evidence presented at trial was sufficient to establish that [Appellant] acted on imperfect self[-]defense after serious provocation without the ability to cool down or reflect?

Appellant's Brief at 4.

Appellant challenges the trial court's denial of a jury instruction on imperfect self-defense, otherwise known as unreasonable belief voluntary manslaughter. *Id.* at 23-33. It is well-settled that "[o]ur standard of review when considering the denial of jury instructions is one of deference - an appellate court will reverse a [trial] court's decision only when it abus[es] its discretion or commit[s] an error of law." **Commonwealth v. Green**, 273 A.3d 1080, 1084 (Pa. Super. 2022) (original brackets omitted), *quoting* **Commonwealth v. Galvin**, 985 A.2d 783, 798-799 (Pa. Super. 2009), *appeal denied*, 289 A.3d 522 (Pa. 2022). A "trial court is not required to give every charge that is requested by the parties and its refusal to give a

---

[4] Both Appellant and the trial court complied with Pennsylvania Rule of Appellate Procedure 1925. **See** Pa.R.A.P. 1925.

requested charge does not require reversal unless the [defendant] was prejudiced by that refusal." **Green**, 273 A.3d at 1084 (original quotation marks and citation omitted).

Section 2503 of the Crimes Code defines voluntary manslaughter, in pertinent part, as follows:

### § 2503. Voluntary manslaughter

. . .

**(b) Unreasonable belief killing justifiable.** - A person who intentionally or knowingly kills an individual commits voluntary manslaughter if at the time of the killing he[, or she,] believes the circumstances to be such that, if they existed, would justify the killing under Chapter 5 of this title (relating to general principles of justification), but his[, or her,] belief is unreasonable.

18 Pa.C.S.A. § 2503(b). "Unreasonable belief" voluntary manslaughter is commonly referred to as "imperfect self-defense." **Commonwealth v. Sanchez**, 82 A.3d 943, 980 (Pa. 2013); **see also Green**, 273 A.3d at 1087. Imperfect self-defense voluntary manslaughter involves an uncontrollable fear or terror of death or great bodily harm, "conceivable as existing [from the defendant's subjective belief] but not reasonably[, or objectively,] justified by the circumstances." **Green**, 273 A.3d at 1088, *quoting **Commonwealth v. Light***, 326 A.2d 288, 294 (Pa. 1974); **see also Commonwealth v. Tilley**, 595 A.2d 575, 582 (Pa. 1991) (stating, "imperfect self-defense" is "imperfect in only one respect - an unreasonable rather than a reasonable belief that deadly force was required to save the [defendant's] life"). Stated differently, imperfect self-defense requires that a defendant hold a subjective belief in the

- 6 -

danger of, *inter alia*, death or serious bodily injury and that the defendant's belief, as determined by the trier-of-fact, be unreasonable under the circumstances. ***Green***, 273 A.3d at 1089 (stating, "[i]mperfect self-defense has two components: the defendant's subjectively held belief of danger posed by the victim and the objective measurement of that belief"). "[T]he defendant must have acted out of an honest, bona fide belief that he[, or she,] was in imminent danger, which involves consideration of the defendant's subjective state of mind." ***Commonwealth v. Smith***, 97 A.3d 782, 787 (Pa. Super. 2014), *quoting* ***Commonwealth v. Mouzon***, 53 A.3d 738, 752 (Pa. 2012). "A defense of imperfect self-defense exists where the defendant actually, but unreasonably, believed that deadly force was necessary." ***Commonwealth v. Truong***, 36 A.3d 592, 599 (Pa. Super. 2012) (*en banc*) (citation and original quotation marks omitted), *appeal denied*, 57 A.3d 70 (Pa. 2012).

Imperfect self-defense "will only justify a voluntary manslaughter instruction in limited circumstances: where a defendant held an unreasonable rather than a reasonable belief that deadly force was required to save his or her life, and all other principles of justification under 18 Pa.C.S.[A.] § 505 have been met." ***Sanchez***, 82 A.3d at 980 (original quotation marks omitted), *quoting* ***Tilley***, 595 A.2d at 582. The "other principles of justification" under Section 505 require that "the defendant did not provoke the threat that resulted in [a victim's death]" and "the defendant did not

violate a duty to retreat."[5] ***Commonwealth v. Jones***, 271 A.3d 452, 458 (Pa. Super. 2021), *appeal denied*, 282 A.3d 1122 (Pa. 2022), *cert. denied*, 142 S.Ct. 469 (2022).

To be entitled to an imperfect self-defense jury instruction, a defendant must show he or she was protecting himself or herself against the use of unlawful force. ***Commonwealth v. Serge***, 837 A.2d 1255, 1266 (Pa. Super. 2003), *aff'd*, 896 A.2d 1170 (Pa. 2006), *cert. denied*, 549 U.S. 920 (2006). "[A] trial court shall charge on [imperfect self-defense] only when requested, where [] the offense of [imperfect self-defense (unreasonable belief voluntary manslaughter)] has been made an issue in the case[,] and the trial evidence could reasonably support a verdict on it." ***Commonwealth v. Carter***, 466

---

[5] Section 505 of the Crimes Codes states, in pertinent part, that

> The use of deadly force is not justifiable under this section unless the actor believes that such force is necessary to protect himself[, or herself,] against death, serious bodily injury, kidnapping[,] or sexual intercourse compelled by force or threat; nor is it justifiable if:
>
> > (i) the actor, with the intent of causing death or serious bodily injury, provoked the use of force against himself[, or herself,] in the same encounter; or
> >
> > (ii) the actor knows that he [or she] can avoid the necessity of using such force with complete safety by retreating, except the actor is not obliged to retreat from his[,or her,] dwelling or place of work, unless he[, or she,] was the initial aggressor or is assailed in his[, or her,] place of work by another person whose place of work the actor knows it to be.

18 Pa.C.S.A. § 505(b)(2).

A.2d 1328, 1329, 1332 (Pa. 1983) (recognizing that, the unconditional requirement that an "imperfect self-defense" instruction be provided "only serves to confuse juries and invite them to base their verdicts on whim and caprice"). "Although a defendant has no burden to prove a claim of [imperfect] self-defense before such a defense is properly in issue, there must be some evidence, from whatever source, to justify such a finding." ***Sanchez***, 82 A.3d at 980 (original quotation marks and citation omitted). "Before the issue of self-defense may be submitted to a jury for consideration, a valid claim of self-defense must be made out as a matter of law, and this determination must be made by the trial judge." ***Commonwealth v. Chine***, 40 A.3d 1239, 1244 (Pa. Super. 2012) (citation omitted), *appeal denied*, 63 A.3d 773 (Pa. 2013). "In determining whether the evidence would support [an imperfect self-defense instruction, courts] must view the evidence in the light most favorable to the defendant." ***Commonwealth v. Soltis***, 687 A.2d 1139, 1141 (Pa. Super. 1996).

In support of his claim that the trial court erred in failing to instruct the jury on imperfect self-defense, Appellant contends that he "presented evidence to establish that [he] thought [the victim], who had been violent when inebriated in the past, was going to get a knife to use [] on him." Appellant's Brief at 27. Appellant also contends that he "presented evidence that [the victim] had already just hit him and injured [him] shortly before telling him she was going to get a knife and head[ed] towards the kitchen where the knives were located." ***Id.*** Appellant asserts that this evidence

established his subjective, albeit unreasonable, belief that he was "in imminent threat of deadly harm and that deadly force was necessary to prevent that harm[.]" *Id.* at 27-28. Citing the same events, Appellant asserts that he did not provoke the victim's use of force against him, since his testimony established that the victim, acting without provocation, struck him with a chair leg after she became enraged at the sight of the broken chair. *Id.* at 28. Finally, Appellant avers that he did not have a duty to retreat from his own home. *Id.* The fact that he had already been attacked by the victim and struck with a chair leg, Appellant argues, coupled with the fact that the victim told him she was going to get a knife and moved in the direction where the knives were stored justified the imperfect self-defense instruction. *Id.* at 30.

In denying Appellant's request for an imperfect self-defense jury instruction, the trial court stated,

> I'm still focused on the fact that the victim was shot on the ground after it was clear that she was unarmed, and I think that's what – those are the facts that really take this out of [imperfect self-defense].

N.T., 9/1/23, at 817. The trial court further explained,

> the evidence presented at trial did not support either a reasonable or unreasonable belief that Appellant was in fear for his life. Dr. Edward Mazuchowski [("Dr. Mazuchowski")], an expert in the field of forensic pathology, testified extensively regarding [the victim's] autopsy and the trajectory of the gunshot wounds through the victim's body. In particular, the gunshot wound to [the victim's] head was "from the back to the front and downward." Corporal Joseph Horton of the Pennsylvania State Police Bureau of Forensic Services, an expert in the field of firearm and tool mark

- 10 -

examination, testified that when a bullet exits a firearm it will[] "proceed in the direction that the firearm was pointed." This evidence demonstrated that [the victim] was shot through the back of the head while facing away from Appellant.

Moreover, the evidence established that Appellant shot [the victim] a total of five times. The testimony of Fairview Township Chief of Police Jason Loper [("Chief Loper")] and Fairview Township Detective Jason Lotier [("Detective Lotier")] established that projectiles were found underneath [the victim's] body. The testimony of Dr. Mazuchowski established that [the victim] was in a face[-]down position after she was deceased. Thus, the Commonwealth demonstrated that Appellant shot [the victim] while she was already on the ground.

Furthermore, Appellant's own testimony revealed that he "pursued" [the victim] after she stated, "I'm getting a knife." Appellant testified that after [the victim] made this statement, she left the bedroom and walked down the hallway toward the kitchen. Appellant testified that he retrieved his handgun, "clicked the magazine in," and "pulled the slide back to get a bullet in the chamber." Appellant then followed [the victim] into the hallway towards the kitchen. Appellant testified that he asked [the victim] "many times to stop" and then pulled the trigger while aiming the handgun in [the victim's] direction.

Appellant's testimony revealed that [the victim] was not attacking or coming towards Appellant at any point during the five shots. Additionally, [the victim] was unarmed. [The victim's] body was found [] between the dining room and kitchen. At no point did the evidence show that [the victim] entered the kitchen to retrieve a knife, or that [the victim] physically possessed a knife at any time.

Based on the evidence presented at trial, the [trial] court [found] no basis for either a reasonable or unreasonable belief that deadly force was necessary.

- 11 -

Trial Court Opinion, 3/26/24, at 14-16 (extraneous capitalization, record citations, and original brackets omitted).[6]

Upon review, we concur with the trial court, and the record supports, that Appellant was not entitled to an imperfect self-defense jury instruction. Appellant testified that, on the night of the murder, he became intoxicated and the victim was "very drunk." N.T., 8/31/23, at 682. At some point during the evening, Appellant and the victim ended up at the neighbors' house where the victim told the neighbors that "she was a pothead." *Id.* at 693. The victim's statement "upset" Appellant. *Id.* In the process of helping the victim home, due to her intoxicated state, Appellant testified that he became angry again after the victim fell, asking the victim, "why are you doing this to me again[?]" *Id.* at 694-695. Appellant stated that, after becoming angry at the victim, he walked away from the victim and toward the house, entered the house, and locked the door. *Id.* at 695. Once inside, Appellant stated that he was trying to calm down and cool off when he grabbed a dining room chair and banged it against the wall until it broke into several pieces. *Id.* at 696. Appellant then went to bed. *Id.*

At some point, Appellant awoke to someone knocking at the door. Upon answering the door, Appellant found one of the neighbors and the victim. *Id.*

_____

[6] We note that, in its brief to this Court, the Commonwealth's "argument" in support of the trial court's denial of an imperfect self-defense jury instruction is a verbatim reiteration of the rationale set forth by the trial court in its Rule 1925(a) opinion. *Compare* Commonwealth's Brief at 14-16 *with* Trial Court Opinion, 3/26/24, at 14-16.

at 697. When the victim entered the house and discovered the broken chair, Appellant testified she became angry and a verbal argument ensued. *Id.* at 698. Appellant stated that the argument turned violent when the victim retrieved a chair leg and began swinging the chair leg at Appellant's head, striking him in the left shoulder and right hand, breaking one of his fingers. *Id.* at 698-699. Appellant stated that he wanted to "get away" from the victim so he retreated to the couple's bedroom. *Id.* at 699.

Appellant testified that the victim followed him into the bedroom, but no longer had the piece of broken chair. *Id.* at 700. A verbal argument between the couple continued and, at one point, the victim told Appellant, "I'm getting a knife" and left the bedroom. *Id.* Appellant stated that he "believed that [the victim] was going to get a knife and that she was going to attempt to harm [him] again." *Id.* at 701. Appellant then retrieved his handgun from its storage case alongside the bed, clicked the magazine into place, and cocked the slide to chamber a bullet for firing. *Id.* at 701. Appellant then followed the victim down the hallway, yelling at the victim to not get a knife. *Id.* at 701-702. Appellant testified that he recalls firing the first shot at the victim but does not remember firing the remaining shots at the victim. *Id.* at 704.

On cross-examination, Appellant described himself as being six feet, two inches tall and weighing between 210 and 235 pounds at the time of the incident. *Id.* at 731-732. Appellant described the victim as being five feet tall and weighing around 140 pounds. *Id.* Appellant testified that during the verbal argument in the bedroom, he did not fear for his life. *Id.* at 745. After

the victim stated that she was going to get a knife and left the bedroom, Appellant explained that he imagined the victim would retrieve a chef's knife from the kitchen drawer located to the right of the oven. At that moment, Appellant became afraid the victim would inflict significant harm or possibly kill him. *Id.* at 746, 751. Appellant admitted, however, that, after the victim left the bedroom, he could no longer see her. *Id.* at 747. Appellant recalled pointing the handgun at the victim and firing the first shot when she was "a little further down the hallway than [he] was" and before she reached the kitchen, where the chef's knife was located. *Id.* at 748-750. Appellant stated that, when he fired the first shot at the victim, the victim was not in the kitchen, did not have a piece of the broken chair in her possession, and was not holding the chef's knife. *Id.* at 749-750, 752. On cross-examination, the Commonwealth asked Appellant whether he feared for his life at the time he fired the first shot at the victim. The following exchange occurred:

| [Commonwealth:] | Well, you testified that you were in fear of your life, right? |
| [Appellant:] | Yes, at that time, yes. |
| [Commonwealth:] | And did you believe that you needed to take her life before she took yours? |
| [Appellant:] | I do not believe that I needed to take her life, no. |
| [Commonwealth:] | You do not believe that? |
| [Appellant:] | I was not thinking that I needed to take her life at that time, no. I was thinking that I needed her to stop. |

| [Commonwealth:] | You did not believe that you needed to kill her, right? |
|---|---|
| [Appellant:] | At that moment, I needed her to stop. Thinking now, I did not need to kill her, I understand that, but at that moment, I needed her to stop. |
| [Commonwealth:] | So in the moment, you just wanted her to stop walking towards the kitchen, right? |
| [Appellant:] | I wanted her to stop the threat. I wanted her to stop moving towards the kitchen and continuing what I believed was the threat that she made to me. |

*Id.* at 753. Appellant agreed that while he fired several shots at the victim, she was not attacking him and that, at no point, did he see the victim trying to locate the chef's knife in the kitchen. *Id.* at 759-760. Appellant admitted that, during the incident, he never saw the chef's knife. *Id.* at 761.

Chief Loper further testified that the victim was found deceased, lying face down, and that bullets were found under her body. N.T., 8/29/23, at 265-266. Detective Lotier also confirmed that bullets were discovered in the floor underneath where the victim was discovered and next to the victim's head. N.T., 8/30/23, at 531, 534. Dr. Mazuchowski testified an autopsy of the victim confirmed that five gunshot wounds, including three fatal gunshot wounds, entered the victim's body from the back, while she was facing away from Appellant. *Id.* at 475-481.

Appellant's claim merits no relief since the record supports the trial court's determination that Appellant did not act out of an honest, bona fide belief that he was in imminent danger or that he needed to employ deadly

force to protect himself from imminent death or serious bodily injury. When Appellant pursued his unarmed victim down the hallway, he fired upon her from behind and before she reached the kitchen to retrieve the chef's knife. By his own admission, when Appellant fired upon the victim, he did not believe that he needed to take the victim's life before she took his. Therefore, we discern no abuse of discretion or error of law in the trial court's determination that, as a matter of law, Appellant was not entitled to an imperfect self-defense jury instruction.

Judgment of sentence affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 10/31/2024