J-S11004-25           2025 PA Super 85

COMMONWEALTH OF PENNSYLVANIA   :    IN THE SUPERIOR COURT OF
                                        :          PENNSYLVANIA
                                        :
              v.                             :
                                        :
                                        :
NANCY LEE FOCHT                    :
                                        :
           Appellant               :     No. 1425 WDA 2023

Appeal from the Judgment of Sentence Entered October 27, 2023
In the Court of Common Pleas of Bedford County Criminal Division at
No(s): CP-05-CR-0000135-2019

BEFORE: MURRAY, J., KING, J., and LANE, J.

OPINION BY MURRAY, J.:                   **FILED: APRIL 14, 2025**

Nancy Lee Focht (Appellant) appeals from the judgment of sentence imposed after a jury convicted her of one count each of first-degree murder and tampering with evidence.[1] After careful review, we affirm.

On September 11, 2018, Appellant shot and killed David Focht, Sr. (the victim), her husband of 52 years, in a shed outside their home in Bedford County. The couple had a history of verbal abuse, threats, and physical violence. Their son, David Focht, Jr. (David), witnessed countless arguments and fights between his parents over the years. N.T., 9/14/23, at 122-23. David testified "they both gave as well as they got. I've seen it … both ways with my parents." *Id.* at 123-24. David stated, "a lot of times" the victim

---

[1] 18 Pa.C.S.A. §§ 2502(a), 4910(1).

had to defend himself "because [Appellant] would come at him … [and the victim] just tr[ied] to keep her away." **Id.** at 123. David testified his parents initiated divorce proceedings multiple times, but always discontinued the proceedings without obtaining a divorce. **Id.** at 124-25. Appellant also obtained multiple Protection From Abuse (PFA) orders against the victim, but David recalled that Appellant "would sneak and see [the victim]" despite the PFA orders. **Id.** at 124.

Appellant testified that the victim "had a very bad temper" and "hit [Appellant] from the beginning" of their marriage. N.T., 9/15/23, at 30-31. She stated the victim slapped, punched, or kicked her on many occasions. **Id.** at 31-34. She also described several incidents in which the victim threatened her with a gun. **Id.** at 35-43. She testified the victim often accused her of sleeping with someone else, and told her "if you ever think about leaving me[,] I will kill you." **Id.** at 35.

However, Appellant agreed that "the acts of domestic violence" she described "all … happened prior to 2004…." **Id.** at 97; **see also id.** at 57-58 (Appellant's testimony that after 2004, "the only other abuse would be mental abuse," with the victim "always talking … bad things about me."). David testified that, in recent decades, the victim "would try to walk away" from arguments with Appellant. N.T., 9/14/23, at 122. David stated Appellant "would never le[t] something drop," and when the victim walked away, Appellant "tended to come out and just try to keep the fight going." **Id.**

David testified that he lived at his parents' home for two months in the summer of 2018, moving out about three weeks before the shooting. *Id.* at 92; *see also id.* at 97 (David's testimony that he did not see his parents physically or verbally fighting during that two-month period). He stated the victim had numerous health problems at the time. *See id.* at 93-95. In April 2018, the victim suffered a heart attack and underwent bypass surgery. *Id.* at 94. Thereafter, the victim underwent surgery to address clogged arteries in one of his legs. *Id.* at 93. At the time of the shooting, the victim awaited surgery on his other leg. *Id.* David testified the victim had "weak legs" and had to use his arms to stand up from a chair. *Id.* at 93-94. David also confirmed the victim had "been mentally slipping" and that his doctors indicated "he possibly had short-term memory loss…." *Id.* at 95.

On the morning of September 11, 2018, the victim went out to the shed to drink coffee and read the news on his phone. Commonwealth Exhibit 58 (transcript of Appellant's January 27, 2019, recorded police interview (1/27/19 Interview)) at 4-5. David testified the victim "kept all his tools and everything" in the shed, and that on a typical day, the victim would spend time sitting in a chair in the shed. N.T., 9/14/23, at 96. Significantly, the shed was located "exactly 30 feet" from the residence. N.T., 9/13/23, at 249. In the early afternoon, Appellant joined the victim in the shed, where they both drank coffee and talked. 1/27/19 Interview at 5.

The couple discussed Appellant's intent to mow the lawn, including an area which had previously been subject to a boundary dispute between the couple and their neighbor, in which the couple had prevailed. Commonwealth Exhibit 56 (transcript of Appellant's September 11, 2018, recorded police interview (9/11/18 Interview)) at 10. The victim displayed confusion regarding who owned that area and argued with Appellant about their neighbor. *Id.*; 1/27/19 Interview at 5. The couple also argued over outstanding medical bills from the victim's surgeries, with the victim displaying confusion regarding the fact that insurance would cover the vast majority of the bills. 1/27/19 Interview at 5-6. Appellant maintained they only had to pay a small portion of the bills, while the victim insisted they were going to "lose everything" and stated his intent to cancel his upcoming leg surgery. *Id.*; 9/11/18 Interview at 13-15. The victim asked Appellant to promise she would not take him back to the hospital. N.T., 9/15/23, at 67.

During the argument, the victim took off his wedding ring and put it in his pocket, telling Appellant "the next fucking time you see [this ring] you'll be laying in your casket." *Id.* at 74. Appellant stated the victim often took off his wedding ring during arguments. *See* 9/11/18 Interview at 23-24. However, she testified the victim's remark on this occasion made her "absolutely scared[,] … because to me that means he's going to kill me." N.T., 9/15/23, at 74. Appellant left the shed, retrieved a .357 Magnum revolver from the house, and returned to the shed. *Id.* at 74-75.

Appellant fired a shot that missed the victim and hit a toolbox. *Id.* at 120-22. She then fired a second shot that hit the victim on the right side of his chest, piercing his lung. *Id.*; *see also* Commonwealth Exhibit 45 (Autopsy Report) at 1. After the shooting, Appellant placed the gun on the victim's leg. N.T., 9/15/23, at 92.

Appellant called David and told him the victim had threatened her with a gun, "there was a struggle over the gun and the gun went off," and she thought the victim was dead. N.T., 9/14/23, at 86. David told Appellant to hang up and call 911. *Id.* Appellant called 911 and told the dispatcher that the victim got a gun and fired a shot; she threw a chair at him; and he was shot during a fight over the gun. Commonwealth Exhibit 2 (911 call transcript) at 1. Appellant reported the victim's eyes were open and he was still breathing, but he did not respond when she talked to him. *Id.* at 4.

Pennsylvania State Police (PSP) arrived at the scene. Trooper Rusty Hays observed the victim next to a work bench near the wall of the shed, with a revolver on his thigh. N.T., 9/13/23, at 109-11. Observing the victim's weak pulse and shallow breathing, troopers moved him away from the wall, cut off his shirt, and attempted first aid and CPR. *Id.* at 110-15. However, the victim's condition deteriorated, and he was dead by the time paramedics arrived. *Id.* at 115-16.

Troopers took Appellant into custody. *Id.* at 116-17. Later that day, at PSP barracks, Appellant waived her *Miranda*[2] rights and gave a video-recorded interview. *See* 9/11/18 Interview at 2-3. Appellant told the troopers she and the victim argued in the shed; the victim left the shed and returned with a gun; the victim fired a shot; Appellant and the victim struggled over the gun; and during the struggle a second shot discharged and struck the victim. *Id.* at 10-32.

However, PSP's investigation found no gunshot residue on the victim's hands or clothing. *See* Autopsy Report at 1 ("Gross examination of the entrance wound and overlying clothing, as well as [the victim's] hands, reveal no findings to substantiate a close range of fire."); N.T., 9/14/23, at 40-44 (testimony of PSP Sergeant Gesuele Burello, who testified as a ballistics expert). After test-firing the .357 Magnum involved in the shooting and observing its residue deposit range, PSP concluded the fatal shot must have been fired at least four feet away from the victim. *Id.* at 65-67.

On January 27, 2019, Appellant waived her *Miranda* rights and gave a second video-recorded interview at PSP barracks. *See* 1/27/19 Interview at 1-3. Appellant initially gave the same account she gave in her first interview. *See id.* at 3-29. However, after the troopers told Appellant the physical evidence contradicted her story, Appellant admitted she brought the gun into

---

[2] *Miranda v. Arizona*, 384 U.S. 436 (1966).

the shed and fired the shots. *Id.* at 29-38. She claimed the victim saw the gun in her hand and charged at her, and she fired because she feared he would overpower her and take the gun. *Id.* at 36-38, 41-46. Appellant admitted she placed the gun on the victim's leg after the shooting. *Id.* at 40. She stated she initially did not tell the truth about what happened because she was afraid. *Id.* at 52, 57.

After the January 27, 2019, interview, the Commonwealth charged Appellant with criminal homicide[3] and tampering with evidence.[4] Appellant's jury trial commenced on September 13, 2023. The Commonwealth presented Appellant's two recorded police interviews, numerous photographs of the crime scene (including several depicting the victim's body),[5] the autopsy report, and testimony from David, several PSP troopers, and a ballistics expert.

Advancing the affirmative defense of justification, Appellant testified that she retrieved the gun after she felt threatened by the victim's remark regarding his wedding ring. N.T., 9/15/23, at 74-78. She claimed the victim

---

[3] 18 Pa.C.S.A. § 5201(a).

[4] The Commonwealth initially charged Appellant with additional, related offenses, but withdrew those charges before trial. *See* Information, 3/28/19; Amended Information, 9/3/23.

[5] Before trial commenced, Appellant made an oral motion *in limine* to exclude the photographs of the victim's body. N.T., 9/13/23, at 20. The trial court denied the motion and admitted the photographs. *Id.* at 24, 174-75.

- 7 -

saw the gun and charged at her; that she fired the first shot as a warning shot; and she fired the second shot accidentally. *Id.* at 78-83, 119-21. Appellant admitted she placed the gun on the victim's leg, and claimed she lied about the shooting "because I was afraid I would go to jail for something that was just an accident." *Id.* at 88-89, 92.

The Commonwealth contended the victim had been seated in a chair when Appellant shot him, and the shot could not have been fired accidentally. *See* Autopsy Report at 3 (noting the bullet's "downward" trajectory); N.T., 9/15/23, at 120 (Appellant agreeing the victim's chair was near the toolbox that the first shot struck); *id.* at 119-20 (Appellant acknowledging her inconsistent statements regarding whether the victim was sitting or standing when she returned to the shed with the gun); N.T., 9/14/23, at 25-28 (Sergeant Gesuele Burello's testimony that the gun required 11 to 13 pounds of trigger pressure to fire, and has internal safeties to prevent accidental firing).

Pertinent to this appeal, Appellant objected to a proposed jury instruction regarding Appellant's duty to retreat. The trial court overruled the objection, and instructed the jury that Appellant had a duty to retreat if she knew "that she could avoid a necessity of using deadly force with complete safety by retreating." N.T., 9/15/23, at 225.

On September 15, 2023, the jury convicted Appellant of first-degree murder and tampering with evidence. On October 27, 2023, the trial court

imposed a sentence of life imprisonment for first-degree murder, and a concurrent sentence of 1 to 2 years' imprisonment for tampering with evidence. Appellant timely filed a post-sentence motion, which the trial court denied on November 7, 2023. Appellant timely appealed. Appellant and the trial court have complied with Pa.R.A.P. 1925.

Appellant identifies two questions for our review:

1. Whether the trial court erred and committed a violation of law in delivering an incorrect instruction to the jury relative to the question of self-defense and the application of the [c]astle [d]octrine?

2. Whether the trial court erred in overruling [Appellant's] objection to the introduction of photographs of the [victim's] body that were not taken contemporaneously[,] and that were taken … after [the body] had been moved from the scene[, where the photographs] were likely to inflame the hearts and minds of the jury such that any probative value would be outweighed by the prejudicial effect?

Appellant's Brief at 5.

In her first issue, Appellant argues the trial court erred in instructing the jury regarding Appellant's duty to retreat before using deadly force. *Id.* at 11-16. Appellant notes that, under the castle doctrine, a person "is not obliged to retreat from his dwelling…." *Id.* at 12 (quoting 18 Pa.C.S.A. § 505(b)(2)(ii)). Appellant maintains the shed was encompassed within the applicable statutory definition of "dwelling." *Id.* (citing 18 Pa.C.S.A. § 501). Appellant asserts that she and the victim

used the shed as more than a storage area. It contained tables and chairs and was generally used by them as an area for sitting, relaxing, and unfortunately[,] arguing. It was in these ways that

it was being used on the date in question, and [Appellant] had every right to feel safe and secure in her shed. Thus, when attacked by her husband, she had no duty to retreat before employing deadly force in defense of herself.

*Id.* at 15-16.

The Commonwealth argues the statutory definition of "dwelling" did not include the shed. Commonwealth Brief at 16-18. The Commonwealth further argues that even if the shed was considered Appellant's dwelling, she nevertheless had the duty to retreat because she "was the initial aggressor." *Id.* at 13 (quoting 18 Pa.C.S.A. § 505(b)(2)(ii)).

"In reviewing a jury charge, we determine whether the trial court committed a clear abuse of discretion or an error of law which controlled the outcome of the case." *Commonwealth v. Jones*, 323 A.3d 13, 21 (Pa. Super. 2024) (citation omitted); *see also Commonwealth v. Davis*, 326 A.3d 988, 994 (Pa. Super. 2024) ("Only where there is an abuse of discretion or an inaccurate statement of the law is there reversible error.").

> A trial court has broad discretion in formulating and delivering instructions to a jury. When reviewing the exercise of that discretion, an appellate court must evaluate the trial court's instruction as a whole to determine if it was fair or prejudicial. A trial court may use such language as it chooses, so long as the law is clearly, adequately, and accurately presented to the jury for its consideration. We will not rigidly inspect a jury charge, finding reversible error for every technical inaccuracy, but rather evaluate whether the charge sufficiently and accurately apprises a lay jury of the law it must consider in rendering its decision. Error cannot be predicated on isolated excerpts of the charge, but it is the general effect of the charge that controls.

***Commonwealth v. Drummond***, 285 A.3d 625, 634-35 (Pa. 2022) (footnotes and quotation marks omitted).

"The ideological foundation for the castle doctrine is the belief that a person's home is his castle and that one should not be required to retreat from his sanctum." ***Commonwealth v. Childs***, 142 A.3d 823, 828 (Pa. 2016) (citations, quotation marks, and brackets omitted). The castle doctrine is codified at 18 Pa.C.S.A. § 505(b)(2)(ii), which provides:

**(b) Limitations on justifying necessity for use of force.--**

\*\*\*

(2) The use of deadly force is not justifiable under this section unless the actor believes that such force is necessary to protect himself against death, serious bodily injury, kidnapping or sexual intercourse compelled by force or threat; nor is it justifiable if:

\*\*\*

(ii) the actor knows that he can avoid the necessity of using such force with complete safety by retreating, ***except the actor is not obliged to retreat from his dwelling*** or place of work, ***unless he was the initial aggressor*** or is assailed in his place of work by another person whose place of work the actor knows it to be.

18 Pa.C.S.A. § 505(b)(2)(ii) (emphasis added). Under the castle doctrine, a person is not "obliged to retreat from his or her dwelling when assailed by a person who has an equal right to be there." ***Commonwealth v. Derby***, 678 A.2d 784, 787 (Pa. Super. 1996) (holding wife had no duty to retreat from the marital home, where husband threatened to kill her).

"Dwelling" is defined as "[*a*]*ny building or structure, including any attached porch, deck or patio*, though movable or temporary, or a portion thereof, *which is for the time being the home or place of lodging of the actor*." 18 Pa.C.S.A. § 501 (emphasis added); *see also Commonwealth v. Hornberger*, 74 A.3d 279, 286 (Pa. Super. 2013) (noting Black's Law Dictionary, Fourth Edition, defines "lodging place" as "[a] place of rest for a night or a residence for a time; a temporary habitation").

Regarding Appellant's duty to retreat, the trial court instructed the jury as follows:

> [T]he third way in which the Commonwealth may disprove the defense of justification, is if you find beyond a reasonable doubt that [Appellant] had a duty to retreat instead of using deadly force and did not fulfill that duty. A duty to retreat arises where [Appellant] knows that she could avoid a necessity of using deadly force with complete safety by retreating.

N.T., 9/15/23, at 225; *see also id.* at 223-26 (trial court's full jury charge regarding Appellant's defense of justification).

The trial court determined the castle doctrine did not apply here because the shed was not Appellant's "dwelling." Trial Court Opinion, 5/8/24, at 5; *see also* N.T., 9/15/23, at 143-47, 150-52 (discussion and argument regarding the duty to retreat instruction). The trial court determined the shed

> was neither attached to [Appellant's] home, nor was it used as a place of lodging for anyone. In fact, [Appellant] testified that she left the shed in order to enter [] her actual home to retrieve the firearm. Therefore, [the court's] instruction[] to the jury regarding the duty to retreat was an accurate description of the applicable law given the facts and testimony of this specific case.

- 12 -

Trial Court Opinion, 5/8/24, at 5.

We agree with the trial court's analysis. The applicable statute specifically defines "dwelling" as a "building or structure … which is for the time being the home or place of lodging of the actor." 18 Pa.C.S.A. § 501. "Dwelling" does not encompass the entire parcel of property on which the actor's home sits, but is limited to the home building itself, along with "any ***attached*** porch, deck or patio…." ***Id.*** (emphasis added). An outbuilding, such as a shed, is not encompassed within the term "dwelling" unless it is attached to the home building or is actually used as the actor's place of lodging. ***Id.*** Here, the shed was not attached to Appellant's home, and neither Appellant nor anyone else actually lived or slept in the shed. While Appellant notes she and the victim used the shed for sitting and relaxing, these activities do not render it a "place of lodging." ***Id.***; ***see also Hornberger***, 74 A.3d at 286 (quoting Black's Law Dictionary, Fourth Edition). We therefore discern no abuse of discretion or error of law in the trial court's instruction to the jury regarding Appellant's duty to retreat. Accordingly, Appellant's first issue merits no relief.[6]

_____

[6] Even if the shed was considered Appellant's "dwelling," the castle doctrine would not absolve her of the duty to retreat if she "was the initial aggressor…." 18 Pa.C.S.A. § 505(b)(2)(ii). Appellant does not argue on appeal that she was not the initial aggressor, ***see generally*** Appellant's Brief, and our review of the trial transcript discloses she did not make that argument below. ***See*** N.T., 9/15/23, at 143-47, 150-52. The Commonwealth contends Appellant's own trial testimony unequivocally established that she was the initial
*(Footnote Continued Next Page)*

In her second issue, Appellant argues the trial court abused its discretion in admitting into evidence four photographs depicting the victim's dead body. Appellant's Brief at 16-17 (citing Commonwealth Exhibits 20, 29, 30, 43). Appellant maintains the photographs "were inflammatory and lacked any essential evidentiary value[,] such that their [value] would clearly outweigh the likelihood of inflaming the minds and passions of the jurors." *Id.* at 17. Appellant notes the photographs "were taken after the [victim's] body had been moved" to enable the troopers to attempt life-saving measures, and "therefore did not accurately depict the scene of the alleged crime." *Id.* at 16. Appellant maintains the photographs were "completely and wholly irrelevant as there was no question that the [victim] suffered a gunshot wound from a firearm possessed by [Appellant]." *Id.*

The Commonwealth counters that the photographs were not inflammatory and "were necessary to establish the location of the gunshot wound and the layout of" the shed. Commonwealth Brief at 21. The Commonwealth maintains

_____

aggressor. *See* Commonwealth's Brief at 14-16; *see also Commonwealth v. Serge*, 837 A.2d 1255, 1267 (Pa. Super. 2003) (where husband shot wife in the marital home, trial court did not err in instructing jury that husband had a duty to retreat if he was the initial aggressor, because the "jury could have fairly inferred from the evidence that the 'initial aggressor' exception to the [castle doctrine] applied…."). Independent of the castle doctrine, use of deadly force is not justifiable if "the actor, with the intent of causing death or serious bodily injury, provoked the use of force against himself in the same encounter…." 18 Pa.C.S.A. § 505(b)(2)(i). Here, the trial court properly instructed the jury regarding this rule. *See* N.T., 9/15/23, at 225.

- 14 -

the photographs were highly relevant. It was important for the jury to see [the victim's] corpse to understand that the bullet entered his side, under the armpit. That is so because [Appellant] claimed that she shot [the victim] while he was charging at her. The location of the wound undermined that testimony.

*Id.* at 19-20. The Commonwealth further argued that Trooper Rusty Hays's testimony clearly explained that the body had been moved and "eliminated any potential confusion [regarding] the positioning of [the victim's] body in the photographs." *Id.* at 20 (citing N.T., 9/13/23, at 110).

"Questions concerning the admissibility of evidence are within the sound discretion of the trial court and we will not reverse a trial court's decision concerning admissibility of evidence absent an abuse of the trial court's discretion." *Commonwealth v. Nestor*, 314 A.3d 863, 869 (Pa. Super. 2024); *see also Commonwealth v. Ivy*, 146 A.3d 241, 250 (Pa. Super. 2016) ("When ruling on a trial court's decision to grant or deny a motion *in limine*, we apply an evidentiary abuse of discretion standard of review.").

Where a photograph "possesses gruesome or inflammatory qualities likely to inflame the passions of the viewer" a trial court must not merely exclude them based on those qualities, but must determine whether their "essential evidentiary value … clearly outweighs the likelihood of inflaming the minds and passions of the jurors."

*Commonwealth v. Lyons*, 79 A.3d 1053, 1069 (Pa. 2013) (quoting *Commonwealth v. Schroth*, 388 A.2d 1034, 1036-37 (Pa. 1978)); *see also* Pa.R.E. 403 (providing the trial court "may exclude relevant evidence if its probative value is outweighed by a danger of," *inter alia* "unfair prejudice….").

- 15 -

When the Commonwealth seeks to introduce photographs of a homicide victim into evidence, the trial court must engage in a two-part analysis. First, the trial court must examine whether the particular photograph is inflammatory. If the photograph is not inflammatory, it may be admitted if it is relevant and can serve to assist the jury in understanding the facts of the case. If the photograph is inflammatory, the trial court must determine whether the photograph is of such essential evidentiary value that its need clearly outweighs the likelihood of inflaming the minds and passions of the jurors.

*Commonwealth v. Woodard*, 129 A.3d 480, 494 (Pa. 2015) (citations

omitted).

[A] criminal homicide trial is, by its very nature, unpleasant, and the photographic images of the injuries inflicted are merely consonant with the brutality of the subject of inquiry. To permit the disturbing nature of the images of the victim to rule the question of admissibility would result in exclusion of all photographs of the homicide victim, and would defeat one of the essential functions of a criminal trial, inquiry into the intent of the actor. There is no need to so overextend an attempt to sanitize the evidence of the condition of the body as to deprive the Commonwealth of opportunities of proof in support of the onerous burden of proof beyond a reasonable doubt. In reviewing a trial court's admission of gruesome photographs, [appellate courts reverse] only for an abuse of discretion.

*Commonwealth v. Walter*, 119 A.3d 255, 286 (Pa. 2015) (citations

omitted).

In its Rule 1925(a) opinion, the trial court referred to the ruling it made

on the record at trial:

I've looked through all the photos…. And … in my opinion the photos depicting the body of the [victim] here are not—I mean it's a homicide case[—but the photos a]re not shocking in any way. I don't think they're going to inflame the jury. I'll hear the testimony as it comes in whenever [the Commonwealth] lay[s]

- 16 -

the foundation for [the photos].[7]  But I'm not seeing anything here where I think the prejudicial effect is going to substantially outweigh the probative value of what [the Commonwealth is] going to get in through the photographs.  So, I'll deny [Appellant's] motion *in limine* on the photographs.

N.T., 9/13/23, at 24 (footnote added); *see also* Trial Court Opinion, 5/8/24, at 5.

Upon examining the photographs, we discern no abuse of discretion in the trial court's determination that they were not inflammatory.  We note that Appellant fails to discuss any specific features or details depicted in the photographs which she contends render them inflammatory.  *See* Appellant's Brief at 16-17.  Even if the photographs were inflammatory, we would agree with the Commonwealth that their depiction of the gunshot wound's location was highly probative in light of Appellant's accounts of how the shooting occurred.  The photographs' evidentiary value clearly outweighed any potential for inflaming the jury.  Accordingly, Appellant's second issue merits no relief.

Judgment of sentence affirmed.

_____

[7] After the Commonwealth laid a foundation for the photographs and moved for their admission, Appellant did not identify any new or expanded grounds for objection.  *See* N.T., 9/13/23, at 174-75.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

DATE: 04/14/2025