J-A25039-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| KEVIN MAURICE MORGAN | : | |
| | : | |
| Appellant | : | No. 3048 EDA 2024 |

Appeal from the Judgment of Sentence Entered September 26, 2024
In the Court of Common Pleas of Montgomery County Criminal Division
at No(s):  CP-46-CR-0004717-2023

BEFORE:   LAZARUS, P.J., BOWES, J., and FORD ELLIOTT, P.J.E.[*]

MEMORANDUM BY FORD ELLIOTT, P.J.E.:          **FILED JUNE 10, 2026**

Appellant, Kevin Maurice Morgan, appeals from the judgment of sentence imposed by the Court of Common Pleas of Montgomery County following his jury convictions of murder of the third degree, possession of a weapon, two counts of endangering the welfare of a child, and three counts of recklessly endangering another person.[1] He raises five claims on appeal, three of which derive from the trial court's ruling precluding the presentation of a justification defense, a fourth that alleges an abuse of discretion by excluding hearsay, and an illegal sentence claim under ***Commonwealth v. Berry***, 323 A.3d 641 (Pa. 2024). We affirm.

---

[*] Retired Senior Judge assigned to the Superior Court.

[1] 18 Pa.C.S. §§ 2502(c), 907(b), 4304(a)1) and 2705, respectively.

On June 27, 2023, Appellant shot and killed Derek Mayo on the 500 block of May Street, in Pottstown, Montgomery County. *See* Opinion, 2/13/25 ("Trial Court Opinion"), 1. The incident was sparked when Appellant's ex-girlfriend, Kelsey Love-Sheller ("Ms. Love"), the mother of their 13-year-old daughter, P.M., arrived to pick up the daughter pursuant to their custody agreement. *See id.*, 1, 3-6. In the car with Ms. Love was Mayo, her then-boyfriend, with whom Appellant had confrontations in the past. *See id.* "The moments leading up to the murder were captured on video from a Ring camera, but not" the shooting. *Id.*, 2 At trial, Appellant argued that he shot the victim in the heat of passion. *See id.*, 2.

Prior to trial, the Commonwealth and defense each filed multiple motions in *limine* to determine what evidence would or would not be admitted at trial. Of relevance to this appeal are four motions: (1) the Commonwealth's motion to preclude evidence of the victim's prior bad acts in which it argued, *inter alia*, that unless Appellant "can point to adequate evidence" to support a claim of self-defense, the evidence is inadmissible, and the victim's past convictions were too remote in time or dissimilar; (2) Appellant's motion to admit evidence of the victim's bad character, including his propensity for violence, specific acts in which the victim assaulted Appellant or threatened violence, his arrest record and prior convictions, in which he argued that it was admissible in the context of his self-defense claim; (3) the Commonwealth's motion to exclude testimony from Appellant's psychological expert – to the effect that Appellant was suffering from Post-Traumatic Stress

Disorder (PTSD) causing him to act in self-defense with respect to the victim's threatening conduct – on the ground that the video evidence demonstrates that Appellant was neither free from fault in provoking the confrontation nor compliant with his duty to retreat; and (4) the Commonwealth's motion to exclude hearsay statements by Appellant to the emergency operator and responding police officer under Pa.R.E. 803(25) because they would be offered to support his defense and not against him. *See* Commonwealth's Motion in Limine to Prevent Defendant from Introducing Self-Serving Statements, 4/5/24, 2-6; Commonwealth's Motion in Limine to Preclude Defense from Introducing Prior Acts of the Decedent, 5/2/24, ¶¶ 8, 13-16; Appellant's Motion in Limine to Admit bad Character Evidence of the Alleged Victim, 5/14/24, ¶¶ 4, 6-9; Commonwealth's Motion to Exclude Testimony of Dr. Frank Dattilio, ¶¶ 7, 20-22; Commonwealth's Motion in Limine to Prevent Defendant from Introducing Self-Serving Statements, 4/5/24, 2-6. The trial court heard argument on these motions and held the first three under advisement. *See* N.T. Motions Hearing, 5/17/24, 6-31. On May 20, 2024, the trial court issued three orders ruling on five pre-trial motions. Of relevance to this appeal, the trial court ruled:

> …after a hearing was held and the evidence presented was considered, this Court has determined that [Appellant] may not raise a claim of self-defense. [Appellant] was not free from fault in provoking the difficulty that resulted in the killing; he violated his duty to retreat; and he used deadly force when confronted with non-deadly force. Therefore, it is hereby ORDERED and DECREED as follows:

- 3 -

[Appellant's] Motion in Limine to Admit Bad Character Evidence of the Alleged Victim is DENIED.

The Commonwealth Motion in Limine to Preclude the Defense From Introducing Prior Acts of the Decedent is GRANTED.

The Commonwealth Motion to Exclude Testimony of Dr. Frank Dattilio is GRANTED.

Order, 5/20/24 (ruling on three pre-trial motions).

Appellant filed a motion for reconsideration arguing that his use of "insulting words" to Ms. Love and the victim in the run up to the fatal shooting did not constitute evidence of an intent to cause serious bodily harm and so did not constitute provocation, and that after the victim "got out of the car and advanced towards [Appellant and his wife, they] exercised their duty to retreat by continually moving back to avoid contact with [the victim] and telling [him] to stop." Appellant's Motion for Reconsideration of Court's Ruling on the Use of Self-Defense, 5/29/24, ¶ 14-15. He argued accordingly that since "there is evidence from whatever source that will support the three elements of self-defense, then the decision as to whether Mr. Morgan's claims of self-defense and defense of others are valid should be left to the jury and the jury must be charged properly thereon," and with unreasonable belief voluntary manslaughter. *Id.*, ¶ 16-17.

The trial court accurately summarized the trial evidence as follows:

[Around 7:15 p.m. on June 27, 2023, Police Officer Adam Seanor responded to the scene of the shooting, where he found the victim lying in the street, unresponsive, with a gunshot wound to the chest. The officer arrested Appellant. The victim was transported to a hospital by ambulance.]

Detective Adrian Stead […] also responded to scene of the murder on June 27, 2023, and recovered video from a Ring camera. Detective James Lavin of the Montgomery County Detective Bureau narrated the video […] at trial. At 7:10:56 p.m., the car door opened, and P.M. got into the car. [Appellant] put himself between the open door and doorjamb. At 7:11:34 p.m., Julise Morgan, [Appellant's] wife, came out of the house [as Appellant] pursued the car. At 7:11:38 p.m., [she] said, ["]Babe, stop. Seriously.["] [Appellant] appeared to spit at the car as it turned onto Hale Street. At 7:11:44 p.m., the car door opened, and the victim started to step out of the car. At 7:11:46 p.m., [as Appellant] put his left hand up to keep his wife back, he had his hand on his right hip, where the detective had noted earlier there appeared to be a firearm. At 7:12:08, [Appellant's wife returned to their home and entered] the front door, [with Appellant] right in the middle of May Street. At 7:12:11 p.m., the victim was on the ground.

P.M., [Appellant] and Ms. Love's 13-year-old daughter, testified. She explained that […] she was at [Appellant's house] waiting for her mom to pick her up. [Appellant] walked her down the outside stairs and […] to her mom's waiting car. [The victim and P.M.'s brother were also in the car] [Appellant] started to argue with her mom and the victim. He was fighting to keep the door [to the car] open. [He] yelled, "Yo why'd you bring this pussy-ass bitch?" While her mom was telling him to shut the door, [Appellant] was arguing with the victim. P.M. was able to shut door when her mom drove [forward]. The victim said, "Stop right here." He got out of the car, [she then testified that she did not recall what happened until she saw him as he] walked around the car, […] holding his chest, saying he was shot. Her mom got out of car to help.

[Ms. Love] testified that her relationship with [Appellant] ended about when P.M. was three years old.. Originally, [they] had split legal custody, and [Appellant] had custody every other weekend. The custody arrangement changed in 2023, wherein [Appellant] was awarded additional time with P.M. [She also testified about an incident on January 6, 2019, in which Appellant instigated a fight with the victim].

Ms. Love [also] described the events from the day of the murder when she went to pick up P.M. at [Appellant's] house. Prior to her arrival, Ms. Love texted her daughter that she was on her way and to put her location on. She knew where [Appellant] lived, had picked [up] P.M. there between ten and twenty time before.

Before [going] to pick up P.M., Ms. Love stopped [at her] home to pick up the victim and her son. When she arrived, she parked across the street from [Appellant's] house. Several minutes later, P.M. came outside with [Appellant], [who] hugged her [and] opened the car door. [P.M.] got inside and [Appellant] started yelling[,very aggressively,] "Why'd you bring that pussy-ass bitch to my house?" Ms. Love told [Appellant] to shut her car door, and he said, ["]No. I told you not to bring anybody to my house. Why did you bring this pussy-ass bitch to my house? Why did you bring this punk to my house?" The victim responded, "[Y]ou really want to do this? You're going to do this in front of your daughter?" Ms. Love yelled to shut the door, [Appellant] and [the] victim were also yelling. [Ms. Love confirmed that Appellant had told her "multiple times that there would be problems if I brought anybody to his house."]

[…]Ms. Love pulled up and parked the car, grabbed her son [from the victim's lap,] and turned around [to] put him in his car seat. The victim exited the car. [The] Commonwealth played video [that Ms. Love confirmed was from the day of the shooting and showed her car arriving and Appellant exiting his house.] [While putting her son in his car seat, Ms. Love could see Appellant] standing in the grass, when the victim got out of the car. [Appellant] continued screaming [at the victim]. Two seconds after the victim got out of the car, [Appellant] shot him. [Appellant] had retrieved the gun from his waist. The gun was in right hand. After he shot the victim, [Appellant] ran back into his house.

Trial Court Opinion, 2-5 (record citations omitted).

Appellant and his wife also testified. *See* Trial Court Opinion, 6-8. They both stated that after Ms. Love's car turned right at the corner it stopped and the victim exited. *See* N.T. Trial, 6/12/24, 122-123, 224-225. They both said that the victim was coming towards them and said, "[T]his what you want?" as he reached for what they both said they believed was a gun. *See id.*, 123-126, 224-225. Appellant then shot the victim before running into his house after his wife. *See id.*, 126, 225-226.

Prior to the last day of trial, trial counsel argued that its motion for reconsideration of the preclusion of his justification defense should be granted based on the arguments therein and the trial evidence. *See* N.T. Trial, 6/13/24, 5-9. The trial court denied the motion, noting that Appellant's argument "ignore[d]" that his conduct went "way beyond" words, but included forcing his head and shoulders into the car, impeding the closing of the door and then pursuing and spitting at the car when it began to move, thereby continuing the difficulty. *See id.*, 9. The court concluded that Appellant was not free from fault and violated his duty to retreat. *See id.* It stated that Appellant "was the aggressor here. He had a deadly weapon when confronted with non-deadly weapons and nondeadly force. The video ma[de] it very clear that he [was] not entitled to self-defense, and he [was] not entitled to mistaken belief" voluntary manslaughter instructions. *Id.*, 9-10.

After the ruling, Appellant recalled a neighbor who was present after the shooting and presented five witnesses to testify to his reputation for peacefulness, including one of those five to also testify to the circumstances in 2012 when Appellant was threatened as a witness in a separate murder trial, which may have informed his decision to carry a firearm regularly. *See* N.T. Trial, 6/13/24, 12-17, 19-30, 32-41.

The parties then presented closing arguments. *See* N.T. Trial, 6/13/24, 44-104. The trial court charged the jury. *See id.*, 107-126. Neither party objected nor took exception to the court's jury instructions. *See id.*, 127. The jury returned a verdict, finding Appellant not guilty of murder of the first

degree and guilty of the above-referenced offenses. *See id.*, 136-137. The trial court deferred sentencing and ordered a pre-sentence investigation report (PSI) and mental health evaluation. *See id.*, 139.

At the sentencing hearing, the Commonwealth and the defense agreed on the applicable sentencing guideline standard range for each conviction. *See* N.T. Sentencing, 9/26/24, 5. The Commonwealth presented victim impact testimony. *See id.*, 6-28. Appellant presented his psychological expert to testify about his mental health and family history and opine that he was prone to "misinterpreting or viewing" the victim's actions as posing an intent to harm him. *See id.*, 32-58. Appellant also presented several witnesses to testify to conduct or character of his they believed supported leniency. *See id.*, 59-100. During his allocution, Appellant stated that the incident was driven by "a moment of unimaginable fear," that he suffers from PTSD, is not a violent person, strives to do what is right and to be a good father, is deeply remorseful, and asked for leniency for the sake of his family. *See id.*, 100-102.

The court set out the material it considered in determining Appellant's sentence, both for and against leniency. *See* N.T. Sentencing, 9/26/24, 124-126. It concluded that the factor that carried significant weight was that Appellant had "acted without lawful justification" to kill "an unarmed man at a custody exchange in front of two children." *Id.*, 127. The court found that the impact of the crime was high, both on the victim's family and on society from the senseless gun violence. *See id.* The court's intent in imposing

sentence was to "reflect each separate victim here and the fact that two were very young children." *Id.* The court imposed an aggregate of twenty-three to fifty-one years' imprisonment. *Id.*, 129. It imposed consecutive terms of imprisonment of: ten to twenty years for murder of the third degree; one and one-half to three years for one count of endangering the welfare of a child; and six to twenty-four months on each of three three counts of recklessly endangering a person. *Id.*, 128-129. The court also imposed concurrent terms of imprisonment of one and one-half to three years on the remaining count of endangering the welfare of a child and of six to twenty-four months for possession of a weapon. *Id.*

Appellant filed a timely post-sentence motion in which he sought reconsideration of his sentence because the court failed to adequately weigh his rehabilitative needs and remorse, and also because it considered prior criminal acts. *See* Appellant's Post-Sentence Motion for Reconsideration of Sentence, 10/5/24, 1-2. The court denied the motion. *See* Order, 10/21/24.

Appellant filed a timely notice of appeal. *See* Appellant's Notice of Appeal, 11/7/24. The court ordered Appellant to file a concise statement of the errors complained of on appeal. *See* Pa.R.A.P. 1925(b); Order, 11/13/24. Appellant complied, filing a statement with eight separately enumerated claims. *See* Appellant's Rule 1925 Statement of Matters Complained of on Appeal, 1-4.

Appellant raises the following five issues for our review:

1. Did the trial [c]ourt err when it precluded [Appellant] from presenting the defense of self-defense?

2. Did the trial court err when it precluded [Appellant] from presenting his expert who would have opined relevant information in the form of an opinion that [Appellant] had a subjective belief that he and his wife and unborn child were in danger for their lives?

3. Did the trial [c]ourt err when it refused to give the jury an instruction on self-defense?

4. Did the trial [c]ourt err when it precluded [Appellant] from presenting his 911 call after the shooting, where his statements made on the call were admissible as an excited utterance?

5. Is [Appellant's] sentence illegal because the trial Court violated **Commonwealth v. Berry**, [323 A.3d 641 (Pa. 2024)]?

Appellant's Brief, 3 (suggested answers omitted).

In his first claim, Appellant argues that the trial court erred by precluding him from presenting a justification defense. **See** Appellant's Brief, 10. The trial court did so because it ruled pre-trial, based on video evidence, that Appellant "was not free from fault in provoking the difficulty that resulted in the killing; he violated his duty to retreat; and he used deadly force when confronted with non-deadly force." Order, 5/20/24. Appellant contends this ruling was erroneous.

A claim of self-defense or justification requires evidence establishing three elements: (1) that the defendant reasonably believed that he was in imminent danger of death or serious bodily injury and that it was necessary to use deadly force against the victim to prevent such harm; (2) that the defendant was free from fault in provoking the difficulty which culminated in the slaying; and (3) that the defendant did not violate any duty to retreat.

*See Commonwealth v. Mouzon*, 53 A.3d 738, 740 (Pa. 2012); 18 Pa.C.S. § 505(a). However, "before the defense is properly in issue, there must be some evidence, from whatever source, to justify such a finding." *Id.* (internal quotation marks omitted). If a defendant introduces evidence of self-defense, the Commonwealth then bears the burden of disproving the claim beyond a reasonable doubt. *See Commonwealth v. Houser*, 18 A.3d 1128, 1135 (Pa. 2011).

Appellant argues that, under *Commonwealth v. Serge*, 837 A.2d 1255, 1266 (Pa. Super. 2003), he could only have been found not free from fault if he "use[d] deadly force after the initial threat has completely ceased." Appellant's Brief, 10 (emphasis omitted). He asserts there was "no evidence that [he] continued or provoked the difficulties after they began." *Id.* In his view, the heated argument that led to the killing "is of no moment," because the victim "was not shot while he argued and exchanged hostilities with [Appellant] while he was inside the car." *Id.* "Rather, the 'difficulty' at issue began when [the victim] jumped out of his car and charged toward Appellant and his pregnant wife." *Id.*, 11. In support of this argument before the trial court, Appellant asserted that words alone "do not suffice to establish the requisite provocation to negate a claim of self-defense." Appellant's Motion for Reconsideration of Court's Ruling on the Use of Self-Defense, 5/29/24, ¶ 13 (citing *Mouzon*). In sum, he contends that there were two confrontations, not one, in the first he used insulting words and in the second he was attacked by the victim, unprovoked. *See* Appellant's Brief, 11.

Appellant also argues that the trial court erred by finding that he violated his duty to retreat. Citing **Commonwealth v. Ventura**, 975 A.2d 1128, 1143 (Pa. Super. 2009), he claims that he had no duty to retreat unless it was possible to do so with complete safety. **See** Appellant's Brief, 11. He contends that he was in fact "retreating when he had to shoot" the victim. **Id.** (emphasis omitted). He asserts that he could not retreat inside his own home because his children were inside, and he did not have to do so when he had the opportunity after Ms. Love drove away. **See id.**, 12. As with his provocation, he believes that the victim jumping out of the car started a new confrontation for which he was free from fault and had no duty to avoid by retreating on an open city street. **See id.** 12-13.

The trial court explained on the record that it denied the reconsideration motion, as follows:

> The motion is denied. The evidence is very, very clear that [Appellant] was not free from fault in provoking or continuing the difficulty. What [trial counsel] ignores is [that] there was conduct way beyond verbal words. [Appellant] had his head and shoulders in the car; he was impeding the closing of the door, of the vehicle; once the vehicle left, he pursued the vehicle; he spit at the vehicle; instead of retreating, he pursued the vehicle and kept the difficulty ongoing.
>
> That was his conduct that did that. He was not free from fault from violating the duty to retreat. He was the aggressor here. He had a deadly weapon when confronted with non-deadly weapons and non-deadly force.
>
> The video makes it very clear that he is not entitled to self-defense, and he is not entitled to mistaken belief [voluntary manslaughter].

N.T. Trial, 6/13/24, 9-10. In its written opinion, the court explained further that the "video was very clear, [Appellant] provoked the threat and perpetuated and escalated the difficulty." Trial Court Opinion, 16. Moreover, Appellant "could not claim he did not violate his duty to retreat. When that car drove away, there was nothing in the way prohibiting [him] from simply going back into his house." *Id.*, 16-17. "Even with the proposed testimony of [Appellant], his wife, and his daughter, it was plainly visible that [Appellant] provoked, escalated the difficulty, and [] failed to retreat." *Id.*, 17.

Upon our review of the record, we agree that Appellant did not proffer evidence sufficient to establish the justification defense. The video, corroborated by testimony at trial, supports the court's conclusion that Appellant provoked the confrontation by aggressively attempting to enter Ms. Love's car once he realized that the victim was also in the car. *See* N.T. Trial, 6/11/24, 93-95, 160-162; N.T. Trial, 6/12/24, 71-72. Appellant had informed Ms. Love "multiple times that there would be problems if [she] brought anybody to his house." N.T. Trial, 6/11/24, 162. He was yelling at Ms. Love, "why did you bring this pussy ass bitch to my house," referring to the victim. *Id.* 93, 160-161. Appellant had his shoulder inside the car, preventing his daughter from closing the door, as Ms. Love told her to do. *See id.*, 94,161; N.T. Trial, 6/12/24, 72. He argued directly with the victim, who responded, "[Y]ou really want to do this? You're going to do this in front of your daughter?" N.T. Trial, 6/11/24, 161. Ms. Love yelled to shut the door, Appellant and the victim were also yelling. *See id.*, 94, 160-161. Ms. Love

confirmed that Appellant had told her "multiple times that there would be problems if [she] brought anybody to his house." *Id.*, 162. When Ms. Love pulled the car forward, Appellant had to step away from the car but then pursued it and spit in the direction of the car. N.T. Trial, 6/12/24, 73-74.

"[I]n order to find that the defendant had forfeited his right to self-defense pursuant to the doctrine of provocation, the facts must support the statutory requirement that the defendant, with the *intent of causing death or serious bodily injury,* provoked the use of force." **Commonwealth v. Samuel**, 590 A.2d 1245, 1248 (Pa.1991). Appellant's aggressive and angry response, while armed with deadly force, upon seeing the victim were actions that constitute "an intent to cause death or serious bodily injury." **Id.**; **see also Mouzon**, 53 A.3d at 751 (finding provocation sufficient to vitiate a claim of self-defense where "the uncontradicted evidence [] shows that [Mouzon's] words and actions were substantially more provocative than a mere verbal insult" and included a threat to kill).

Appellant's principal argument is that there were two confrontations, the first ending when Ms. Love drove her car away. However, the car only went as far as the corner to turn – so that Ms. Love could shift her youngest child from the victim's lap to a car seat – at which point the victim jumped out of the car. **See** N.T. Trial, 6/11/24, 162. Two seconds later, Appellant fired the fatal bullet. **See id.**, 164. We find that the trial court correctly rejected Appellant's argument that the victim started a wholly new confrontation by almost immediately responding to Appellant's provocation. **See Samuel**, 590

- 14 -

A.2d at 1249 ("Even if the initial display of [Samuel's] gun could be seen as provocative, the balance between the parties shifted when [the victim] left the room and [Samuel] retreated to the dining area, setting down his weapon").[2] Appellant neither acted in a manner to indicate a cessation of hostilities nor retreated, in fact he pursued the car briefly, in the moments between the car moving away and the victim's emergence. Accordingly, it was Appellant who provoked the victim's use of force – or potential use of force – which necessarily was less than deadly force as he was unarmed, and as a result, Appellant forfeited the justification defense.

Appellant's reliance on **Serge** fails to persuade us. There, we held that an unreasonable belief voluntary manslaughter jury instruction was correctly denied where Serge claimed that he was entitled to the charge though he had been voluntarily intoxicated at the time of the killing. **See Serge**, 837 A.2d at 1266. In doing so we pointed out that to be entitled to the instruction, Serge had to, **inter alia**, "show that he was free from fault in provoking or continuing

_____

[2] In **Samuel**, the Supreme Court held that the defendant had not forfeited self-defense because, unlike here, "there was "no suggestion that [Samuel] pointed the gun at[,] ... physically assaulted[,] ... threatened[,] ... or [] had any physical contact with the victim" before the two of them had ceased and gone into different rooms. **Samuel**, 590 A.2d at 1248. "As such, up to that point, there was no 'provocation' as defined by the statute to divest an actor of self-defense rights." **Id.** Here, Appellant aggressively confronted the passengers in the car and tried to prevent them from leaving while yelling at and threatening the victim. There was provocation. Moreover, Samuel only raised his gun and fired at the victim *after* the victim had aimed his own gun at Samuel. **See id.** at 1249. Here, only Appellant possessed, used or even threatened deadly force.

the difficulty which resulted in the killing." *Id.* We stated that, even if imperfect self-defense were relevant, Serge had "failed to offer requisite evidence challenging the inference that [he] continued the difficulty which resulted in the killing when he fired the fatal shot into a kneeling, wounded, and non-threatening" victim whom he had claimed had attacked him with a knife. *Id.* Here, the victim was unarmed and Appellant shot him in the chest approximately two seconds after he exited a car parked a short distance away. We discern no support for Appellant's argument from our decision in *Serge*.

Because Appellant had to demonstrate *both* that he was free from fault *and* that he did not violate a duty to retreat, we hereby affirm the trial court's order precluding the justification defense on the ground that Appellant provoked the fatal confrontation. Therefore, we need not review in any depth appellant's claim that he was not obligated to retreat once the victim exited the car. *See* Appellant's Brief, 11-12. We note, however, that in *Ventura*, on which Appellant relies, we stated that the "law does not require an accused to elect an avenue of retreat where a reasonably prudent person would conclude that such a decision would increase his or her exposure to the threatened harm." *Ventura*, 975 A.2d at 1143-44. However, we held that, because Ventura "backed away" after stabbing the victim, the evidence at trial supported "that retreat was possible and there was no evidence that Ventura's retreat would have exposed him to additional harm." *Id.* Here, Appellant claims that he could not safely retreat to his home, yet the trial court, based on the videotape, saw that "there was nothing in the way prohibiting [him]

- 16 -

from simply going back into his house," when Ms. Love drove a short distance away. Trial Court Opinion, 17.

In his second claim, Appellant argues that the trial court abused its discretion when it precluded his psychology expert's testimony and report that he "subjectively feared for his life, and the lives of his wife and unborn child when [the victim] jumped out of the car." Appellant's Brief, 13. Appellant contends that it was error to preclude the expert since it was error to have precluded his justification defense. *See id.*, 14.

"It is well settled that evidentiary rulings are within the sound discretion of trial courts." *Commonwealth v. DiStefano*, 265 A.3d 290, 297 (Pa. 2021). Generally, evidence is admissible if it is relevant. Pa.R.E. 402. "Evidence that is not relevant is not admissible." *Id.* "[W]hile the general rule of the admissibility of relevant evidence is subject to various exceptions, the rule that irrelevant evidence is not admissible is categorical." *Commonwealth v. Cook*, 952 A.2d 594, 612 (Pa. 2008). "Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Pa.R.E. 401.

Appellant proffered the expert testimony and report about his mental state at the time of the shooting in support of his justification defense and for

the defense of unreasonable self-defense voluntary manslaughter.[3] The trial court explained that "for all the reasons self-defense was not at issue in this case, [appellant's expert's] testimony was properly precluded." Trial Court Opinion, 17. The trial court is correct.

We have determined that the justification defense was not available to Appellant because he provoked the fatal confrontation. The same is true for unreasonable belief voluntary manslaughter, which "under this theory is imperfect in only one respect-an unreasonable rather than a reasonable belief that deadly force was required to save the actor's life. All other principles of justification under 18 Pa.C.S. § 505 must still be met in order to establish unreasonable belief voluntary manslaughter." **Serge**, 837 A.2d at 1265-66 (internal brackets omitted). The trial court properly ruled that Appellant provoked the confrontation. Therefore, the proffered expert testimony was not relevant as neither justification nor unreasonable belief voluntary manslaughter were "of consequence in determining the action." Pa.R.E. 401. Accordingly, the trial court did not abuse its discretion by excluding the irrelevant and inadmissible expert testimony and report. **See** Pa.R.E. 402.

In his third claim, Appellant argues that the trial court erred by not instructing the jury on the justification defense. **See** Appellant's Brief, 14. He

_____

[3] In his Rule 1925(b) statement, Appellant also asserted that the expert testimony would be relevant to his heat of passion voluntary manslaughter defense. As the trial court noted, "counsel never raised this theory of admissibility of the evidence." Trial Court Opinion, 17. "Issues not raised in the trial court are waived and cannot be raised for the first time on appeal." Pa.R.A.P. 302(a).

acknowledges that the ruling was dictated by the trial court's determination that the justification defense was not available to him. **See id.**, 14-15. He contends, however, that the trial court's ruling on the instruction was based entirely on the Commonwealth's evidence and erroneously failed to consider his evidence. **See id.** He lists forty-eight separate points of testimony that would have supported a justification defense. **See id.**, 15-20. He admits, however, that the import of all of this testimony was that he "reasonably feared for his life and the lives of his pregnant wife and unborn child" and merely contends that as he previously argued in his brief, he also was free from fault. **Id.**

"Where a defendant requests a jury instruction on a defense, the trial court may not refuse to instruct the jury regarding the defense if it is supported by evidence in the record." **Commonwealth v. DeMarco**, 809 A.2d 256, 261 (Pa. 2002) (footnote omitted). Thus, a "defendant is entitled to an instruction on any recognized defense which has been requested, which has been made an issue in the case, and for which there exists evidence sufficient for a reasonable jury to find in his or her favor." **Commonwealth v. Borgella**, 611 A.2d 699, 700 (Pa. 1992) (citation omitted).

"Before the issue of self-defense may be submitted to a jury for consideration, a valid claim of self-defense must be made out as a matter of law, and this determination must be made by the trial judge. Such claim may consist of evidence from whatever source." **Commonwealth v. Mayfield**, 585 A.2d 1069, 1070 (Pa. Super. 1991) (*en banc*). "Trial courts have long

been tasked with the responsibility of determining whether the facts evinced at trial permit a self-defense instruction." *Commonwealth v. Cannavo*, 199 A.3d 1282, 1288 (Pa. Super. 2018). *See, e.g., Commonwealth v. Tilley*, 595 A.2d 575, 581-82 (Pa. 1991) (affirming trial court's refusal to instruct jury on self-defense because defendant "was unquestionably the aggressor" and because of lack of sufficient evidence to support finding that defendant was protecting himself from unlawful force).

The trial court explained that "the request for [the justification defense] jury instruction was properly denied for the same reasons that the claim of self-defense was prohibited. The video evidence clearly showed that [Appellant] was not free from, fault[.]" Trial Court Opinion, 21. We agree with the trial court's conclusion.

Although Appellant sets out forty-eight separate points drawn from his own testimony,[4] not a single point would support an argument that he was free from fault or even undermine, in any way, the video evidence that he provoked the fatal confrontation. Indeed, Appellant does not contend that any of his forty-eight points do so. He argues only that they collectively prove that he reasonably feared for his and his wife's lives. *See* Appellant's Brief, 21. The missing evidence for a justification defense was not whether his belief was reasonable but that he was not free from fault. Nothing in the recitation of Appellant's testimony at trial alters the deficiency in his proffer on the

_____

[4] Or so we assume, as the more than five-page long list of points does not include a single citation to the record.

- 20 -

justification defense prior to trial. We find that the trial court properly denied the requested justification defense instruction because the defense was not made out as a matter of law where Appellant provoked the confrontation. **See Tilley**, 595 A.2d at 582 (trial court properly declined to issue a justification defense instruction to the jury because "Tilley was clearly not free from fault in provoking or continuing the burglary which resulted in the slaying").

In his fourth claim, Appellant argues that the trial court erroneously excluded recordings of the statements he made to an emergency operator after the shooting. **See** Appellant's Brief, 22. He contends that his assertion that "they came to my house, I believe to kill me" should have been admitted under the hearsay exception for an excited utterance, but he provides no argument that the additional assertions to police officers that he acted in self-defense should have been. **See id.**, 22-23. He argues that, because the statements were made under the stress of excitement after the victim had attacked him, were not made in a narrative format, and were made in a manner in which there was "no time for [him] to engage his reflective faculties," they should have been admitted. **Id.**, 23.

"It is well settled that evidentiary rulings are within the sound discretion of trial courts." **DiStefano**, 265 A.3d at 297. "Accordingly, when a party adverse to a trial court's evidentiary ruling seeks appellate review of that determination, that party carries a heavy burden to demonstrate that the trial court abused its discretion." **Id.**

An appellate court will not find an abuse of discretion based on a mere error of judgment, but rather … where the [trial] court has reached a conclusion which overrides or misapplies the law, or where the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias or ill-will.

*Id.* (citation omitted).

"Hearsay is not admissible," unless an exception applies. Pa.R.E. 802. Appellant's asserted exception to the rule against hearsay is for an excited utterance, that is, a "statement relating to a startling event or condition, made while the declarant was under the stress of excitement that it caused." Pa.R.E. 803(2). For a statement to be an excited utterance, it must be:

[A] spontaneous declaration by a person whose mind has been suddenly made subject to an overpowering emotion caused by some unexpected and shocking occurrence, which that person has just participated in or closely witnessed, and made in reference to some phase of that occurrence which he perceived, and this declaration must be made so near the occurrence both in time and place as to exclude the likelihood of its having emanated in whole or in part from his reflective faculties. … Thus, it must be shown first, that [the declarant] had witnessed an event sufficiently startling and so close in point of time as to render her reflective thought processes inoperable and, second, that her declarations were a spontaneous reaction to that startling event.

*Commonwealth v. Stallworth*, 781 A.2d 110, 119–120 (Pa. 2001).[5] In determining whether a statement is an excited utterance, we have considered the following factors:

_____

[5] "[E]xcited utterances fall under the common law concept of *res gestae*." *Commonwealth v. Murray*, 83 A.3d 137, 157 (Pa. 2013). "While the excited utterance exception has been codified as part of our rules of evidence since 1998, *see* Pa.R.E. 803(2), the common law definition of an excited utterance remains applicable." *Id.*

1) whether the declarant, in fact, witnessed the startling event; 2) the time that elapsed between the startling event and the declaration; 3) whether the statement was in narrative form (inadmissible); and, 4) whether the declarant spoke to others before making the statement, or had the opportunity to do so. These considerations provide the guarantees of trustworthiness which permit the admission of a hearsay statement under the excited utterance exception. It is important to note that none of these factors, except the requirement that the declarant have witnessed the startling event, is in itself dispositive. *Rather, the factors are to be considered in all the surrounding circumstances to determine whether a statement is an excited utterance.*

***Commonwealth v. Keys***, 814 A.2d 1256, 1258 (Pa. Super. 2003) (internal citations and quotation marks omitted; emphasis in original). "The crucial question, regardless of the time lapse, is whether, at the time the statement is made, the nervous excitement continues to dominate while the reflective processes remain in abeyance." ***Id.*** (citation and brackets omitted). Hearsay evidence, moreover, even if within an exception, may be excluded "if its probative value is outweighed by a danger of [*inter alia*]: unfair prejudice, confusing the issues, [or] misleading the jury." Pa.R.E. 403.

During trial, the court sustained the Commonwealth's objection to Appellant's attempt to elicit the substance of his call to the emergency operator. ***See*** N.T. Trial, 6/12/24, 228-229. At the time, Appellant did not proffer a basis to admit the hearsay statements, which had in fact been excluded pre-trial.[6] The following day, Appellant asked the court to reconsider

_____

[6] The substance of Appellant's statements to the emergency operator and responding police officers that he acted in self-defense was the subject of a Commonwealth's motion in *limine,* which sought to preclude them under Pa.R.E. 803(25) because they were self-serving statements by Appellant
*(Footnote Continued Next Page)*

its ruling, and, for the first time, asserted that the statement to the emergency operator came within the excited utterance exception to the rule against hearsay. *See* N.T. Trial, 6/13/24, 11. He did not, however, list any evidence that supported a conclusion that the foundation for the exception had been set out. *See id*.

After brief argument, the court stated, "[i]t is impermissible, self-serving hearsay. It is not admissible." N.T. Trial, 6/13/24, 11. In its written opinion, the trial court explained that it excluded Appellant's hearsay statements because "it was not reliable evidence." Trial Court Opinion, 20. "The excited utterance exception did not apply because [the statements were] self-serving, and the substance of what [Appellant] said on the 911 call was narrative in nature, and in consideration of the surrounding factors of the 911 call, the call was inadmissible." *Id.*

After careful review of the record, we agree with the trial court that Appellant failed to establish a proper foundation for finding that his statements to police officers and the emergency operator were admissible pursuant to the excited utterance exception.[7] We start by assuming that shooting the victim was a startling event that Appellant witnessed, and indeed took part in.

---

offered to support his defense and not against him. *See* Commonwealth's Motion in Limine to Prevent Defendant from Introducing Self-Serving Statements, 4/5/24, 2-6. Prior to trial, Appellant's counsel agreed that the law was as described in the Commonwealth's motion and the statements were excluded. *See* N.T. Motions Hearing, 5/17/24, 4; N.T. Trial, 6/13/24, 11.

[7] We note further that he did not proffer a foundation for the exception, even if we were to assume that the trial court's sustaining of the objection somehow prevented him from doing so.

Appellant's testimony, however, did not establish that he was in an excited state when he called the emergency operator, much less later when he spoke directly to police officers at the scene. It also does not establish that his assertions were spontaneous in any manner. In *toto*, the testimony relevant to a foundation for the exception was as follows:

[Having just described what he was thinking when he shot the victim, including his fear and PTSD, counsel asked Appellant, "what did you do after?].

A. I called the paramedics. And the police. I -- I told [Ms. Love] to like do CPR. And [] she was like, "Back the fuck up. Back the fuck up." Me and my wife both was like trying to tell her to do CPR.

Q. When you were told by [Ms. Love] to get the fuck out of here –

A. (Witness in tears.) I'm sorry. I was so scared.

[short break taken]

Q. Mr. Morgan, after you were told by Ms. Love to get the fuck out of there, did you walk back towards your house with your wife?

A. Yes.

Q. And when you were walking back towards the house, did you call 9-1-1?

A. Yeah.

[The Prosecutor]: Objection; asked and answered.

THE COURT: Sustained.

THE WITNESS: I called.

[The Prosecutor]: That's sustained.

[Q.] How long was that 9-1-1 call?

[The Prosecutor]: Objection; relevance.

THE COURT: What was the question?

[Trial Counsel]: How long was the 9-1-1 call?

THE COURT: Sustained.

N.T. Trial, 6/12/24, 227-229. Although not highlighted at trial or on appeal, Appellant's wife testified that, "when [Ms. Love] said, 'Get the fuck away,' I ran back, and me and [Appellant] were frantic. He was already -- I think he was already on the phone with 9-1-1 at the time." *Id.*, 128.

The evidence here simply does not establish, as it must for the statements to be admissible, that a startling event had rendered the declarant's "reflective thought processes inoperable and, [] that [his] declarations were a spontaneous reaction to that startling event." *Stallworth*, 781 A.2d at 120. Appellant did not describe his declarations as being "a spontaneous reaction" to the shooting. He did not claim to have blurted out that he had been attacked and shot in self-defense without any thought to doing so. Moreover, the wife's description of Appellant as "frantic," like her, when directing Ms. Love to do CPR, does not alone suffice to establish he was in an excited state incapable of reflection when he called the emergency operator. "Rather the crucial question, regardless of time lapse, is whether, at the time the statement is made, the nervous excitement continues to dominate while the reflective processes remain in abeyance." *Commonwealth v. Manley*, 985 A.2d 256, 265 (Pa. Super. 2009). "It is the spontaneity of … an excited utterance [that] is the source of reliability and the

touchstone of admissibility." **Commonwealth v. Gray**, 867 A.2d 560, 571 (Pa. Super. 2005) (citation omitted).

The trial testimony simply did not establish that Appellant was incapable of reflection at the time he called the emergency operator. He had already spoken to Ms. Love and tried to direct her actions. He then called the emergency operator and stated that he had been attacked and had shot his attacker in self-defense. Essentially, Appellant stated a defense for shooting the victim in narrative form. We therefore perceive no abuse of discretion in the trial court's determination that the proffered statements in which Appellant asserts his innocence were not admissible where the surrounding circumstances did not demonstrate that the statements were reliable.

In his fifth claim, Appellant asserts that the trial court imposed an illegal sentence because it supposedly considered "unsubstantiated allegations that [he] had previously 'beaten' Ms. Love while they were in a relationship." Appellant's Brief, 24-25. He contends that consideration of "mere allegations of criminal conduct" render the sentence illegal under **Commonwealth v. Berry**, 323 A.3d 641 (Pa. 2024), because the allegations were an impermissible factor in sentencing. **See** Appellant's Brief, 25-26.

> Generally, a claim challenging a sentencing court's legal authority to impose a particular sentence, as opposed to its exercise of discretion, presents a question regarding the legality of the sentence. Our Supreme Court has explained that illegal sentencing claims arise in "four broad categories" of cases: (1) "a claim that a sentence was imposed pursuant to a facially unconstitutional sentencing statute"; (2) "a sentence was imposed without the fulfillment of statutory preconditions to the court's sentencing authority"; (3) "claims that allege a violation of a

substantive restriction that the Constitution places upon a court's power to apply the statutory sentence to the defendant"; and (4) "the statutory support for the underlying conviction is void *ab initio*."

*Commonwealth v. Davis*, 341 A.3d 808, 812 (Pa. Super. 2025) (citations omitted), *appeal denied*, 2026 WL 263162 (Pa., filed Feb. 2, 2026) (446 MAL 2025). Appellant's challenge to the sentencing court's consideration, within the context of an extensive sentencing hearing, of "mere allegations of criminal conduct," Appellant's Brief, 26, does not fall under any of the categories for an illegal sentence.

In *Berry*, our Supreme Court held that prior arrests that did not lead to convictions were irrelevant to sentencing:

Prior arrests shed no reliable light upon criminal propensity, cannot be used as evidence of bad character or for impeachment purposes, **are not a relevant sentencing consideration**, and have no probative value for establishing a defendant's likelihood of recidivism. Nor are prior arrests a relevant consideration under the Sentencing Code.

*Berry*, 323 A.3d at 649 (footnotes omitted). Considering such irrelevant evidence as a reason for the sentence imposed is an abuse of the court's discretion; it does not render the sentence thereby illegal. *See Davis*, 341 A.3d at 812. ("Because Davis' claim that the sentencing court relied on an impermissible factor in determining his sentence challenges the sentencing court's exercise of discretion, and not its legal authority to impose a sentence, we conclude that he has raised a claim challenging the discretionary aspects of his sentence") (footnote omitted).

Accordingly, Appellant erroneously asserts that the court's consideration of alleged criminal conduct at sentencing rendered his sentence illegal under *Berry*. The proper avenue for review of his substantive claim would have been as a challenge to the discretionary aspects of his sentence. However, Appellant did not raise such a challenge in his brief or in the statement of questions involved. *See* Appellant's Brief, 3 (Statement of Questions Involved; asserting an illegal sentence claim but not a discretionary sentence claim). "No question will be considered unless it is stated in the statement of questions involved or is fairly suggested thereby." Pa.R.A.P. 2116(a). Moreover,

> An appellant who challenges the discretionary aspects of a sentence in a criminal matter shall include any questions relating to the discretionary aspects of the sentence imposed (but not the issue whether the appellate court should exercise its discretion to reach such question) in the statement required by paragraph (a). Failure to comply with this paragraph shall constitute a waiver of all issues relating to the discretionary aspects of sentence.

Pa.R.A.P. 2116(b). By limiting the challenge to the sentence imposed to only its legality, Appellant waived "all issues relating to the discretionary aspects of sentence."[8] *Id.*

Judgment of sentence affirmed.

---

[8] "The right to appellate review of the discretionary aspects of a sentence is not absolute and must be considered a petition for permission to appeal." *Commonwealth v. Buterbaugh*, 91 A.3d 1247, 1265 (Pa. Super. 2014) (*en banc*). Even if Appellant had properly identified his claim based on *Berry* as a discretionary sentencing challenge, he did not include in his brief any of the mandatory requirements for seeking permission to appeal the discretionary aspects of his sentence.

President Judge Lazarus joins the memo.

Judge Bowes files a dissenting memo.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 6/10/2026